# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GILBERT P. HYATT,

    Plaintiff,

v.

ANDREI IANCU,

    Defendant.

Civil Action No. 05-2310 (RCL)
Civil Action No. 09-1864 (RCL)
Civil Action No. 09-1869 (RCL)
Civil Action No. 09-1872 (RCL)

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

## I.    BACKGROUND

Before the Court is the defendant's asserted affirmative defense of prosecution laches in the four above-captioned cases. Prosecution laches is an equitable doctrine that can hold patents unenforceable when an applicant engages in unnecessary and unexplained delays in prosecuting a patent. *See In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002); *Symbol Technologies, Inc. v. Lemelson Medical*, 277 F.3d 1361, 1365-66 (Fed. Cir. 2002) (*Symbol Techs. I*); *Woodbridge v. United States*, 263 U.S. 50, 56 (1923) ("It is a case of forfeiting the right to a patent by designed delay.").

Plaintiff Gilbert P. Hyatt is a prolific inventor who has received more than 70 issued patents and has pending nearly 400 patent applications before the United States Patent and Trademark Office (PTO), the federal agency responsible for examining patent applications and for granting

1

U.S. patents. 35 U.S.C. § 1 et seq. Andrei Iancu is the named defendant in these matters in his official capacity as the Under Secretary of Commerce for Intellectual Property and the Director of the PTO.[1] Because of the nature and lengthy history of the actions at-hand, throughout this opinion the Court refers to the defendant as "PTO."

Mr. Hyatt brought these actions pursuant to 35 U.S.C. § 145 to obtain patents on four of his patent applications following decisions in the Board of Patent Appeals and Interferences, now known as the Patent and Trial Appeal Board (the "Board").[2] Section 145 allows an applicant dissatisfied with the decision of the Board to "have remedy by civil action" in district court, rather than taking an appeal directly to the Federal Circuit.[3] *See also Kappos v. Hyatt*, 566 U.S. 431 (2012). In a series of opinions issued August 23, 2016, the Court found genuine disputes of material fact precluded summary judgment in these matters;[4] trials on the merits would be required with respect to claims in three of the four applications.

After the Court resolved the summary judgment motions, the PTO moved to dismiss these actions for prosecution laches. Def.'s Mot Dismiss, ECF No. 91. In that set of motions, PTO argued that Hyatt's conduct in prosecuting these four patent applications, as well as approximately 400 others, called for dismissal. *Id.* at **8-9 ("Mr. Hyatt's conduct in each application and across his roughly 400 applications has been unreasonable, inexcusable, and warrants dismissal of his pending claims under the equitable doctrine of prosecution laches."). The PTO stressed that some of the applications claim priority to patents over 45 years old, *id.* at *9, and that Hyatt bulk-filed

---

[1] Andrei Iancu has been automatically substituted for Joseph Matal in these actions under Fed. R. Civ. P. 25(d).

[2] Case number 05-cv-2310 relates to the 08/457,211 application (the '211 application); No. 09-cv-1864 relates to the 08/456,398 application (the '398 application); No. 09-cv-1869 relates to the 08/472,062 application (the '062 application); and No. 09-cv-1872 relates to the 08/431,639 application (the '639 application). All docket citations herein are to 05-cv-2310 unless otherwise specified.

[3] At the time Mr. Hyatt filed the present cases, venue lay by statute with the District Court of the District of Columbia. In 2011, Congress amended the venue provision of certain patent-related statutes, including § 145, such that suits under those sections are henceforth to be filed in the Eastern District of Virginia. Pub. L. 112-29, §9 (Sept. 16, 2011).

[4] *See* ECF No. 75 (05-cv-2310); ECF No. 71 (09-cv-1864); ECF No. 75 (09-cv-1869); ECF No. 72 (09-cv-1872).

2

approximately 400 photocopies of eleven applications in the days leading up to the effective date of the General Agreement on Tariff and Trade (GATT) in June 1995.[5] *Id.* It noted an October 24, 1995 meeting, during which Mr. Hyatt agreed to focus each application on a different invention, *id.* at 21, but that some twenty years later, in 2015, Mr. Hyatt revealed that he never had a "master plan" for amending all 400 applications. *Id.* at **30-31. Mr. Hyatt, on the other hand, argued that the PTO was responsible for extensive delay in adjudicating many of the applications, Pl. Mot. Dismiss, ECF No. 101 at **7-9, and made the case that he was entitled to discovery. *Id.* at **37-38.

On March 16, 2017, the Court found that genuine disputes of material fact required treating the motions to dismiss as if they were for summary judgment, and denied them accordingly. ECF No. 116. With leave of Court, the PTO subsequently amended its answers on leave of the Court to assert prosecution laches as an affirmative defense. ECF No. 123.

The Court set the PTO's affirmative defense of prosecution laches across all four actions for a bench trial, which also would consider evidence relating to Mr. Hyatt's approximately 400 pending applications. ECF No. 150. The PTO, bearing the burden of proof on the affirmative defense of prosecution laches and upon agreement of the parties, presented its case-in-chief first.

During the five trial days beginning October 6, 2017, during which the PTO presented its case in chief, the PTO presented the testimony of three witnesses: Robert A. Clarke, Gregory Morse, and Stephen Kunin, its expert witness. The parties also introduced a number of exhibits.

Mr. Clarke has worked for the PTO for 27 years, and he is currently the editor of the Manual of Patent Examining Procedure ("MPEP"), a 3,000-page collection of guidance material for use by patent examiners in the examination of patent applications. Trial Tr. 75:20–76:14 (Oct. 6, 2017

---

[5] The Court has addressed the GATT in previous memorandum opinions. Information about GATT and its impact on patents is available in those opinions or at the websites of the PTO or WTO.

3

A.M. Session). He also spent 9 years examining patent applications, wrote an article on patent procedure, taught more than 600 hours of classes to patent examiners, and served in the Office of Patent Legal Administration (which drafts examination guidelines), as Chief of Staff for the PTO, and as an Administrative Patent Judge. Trial Tr. 75:15–78:21, 81:20–83:16 (Oct. 6, 2017 A.M. Session). Mr. Clarke has had no personal involvement in the examination of Mr. Hyatt's patent applications. In or around 2012, however, Mr. Clarke spent approximately three days reviewing the file histories of approximately 80 of Mr. Hyatt's patent applications that were then subject to an undue delay action brought by Mr. Hyatt in the United States District Court for the Eastern District of Virginia and offered a declaration attesting to certain facts about those patent applications. *See* Trial Tr. 55:5–56:14 (Oct. 6, 2017 P.M. Session).

Mr. Morse is currently Supervisory Patent Examiner ("SPE") of Art Unit 2615, which is assigned to examine Mr. Hyatt's pending patent applications. Mr. Morse has worked at the PTO since 1992 and has been supervising the examination of Mr. Hyatt's patent applications since March 2013. Trial Tr. 72:19–75:3 (Oct. 10, 2017 A.M. Session). Before March 2013, Mr. Morse had no involvement in the examination of Mr. Hyatt's patent applications. Trial Tr. 47:14–49:5 (Oct. 11, 2017 P.M. Session).

Mr. Kunin, PTO's retained expert, testified as to PTO patent policy, practice, and procedure, and how the prosecution of the applications at-issue in these cases presented uniquely difficult circumstances for the PTO. Mr. Kunin, an attorney with an engineering background and over thirty years of service in the PTO, rose to very senior positions within the agency, including spending ten years as its Deputy Commissioner for Patent Examination Policy. In that position he provided administrative oversight to and coordinated the activities of several offices within the PTO, and was responsible for the promulgation of patent examination guidelines and training

materials. DX-1486 at paras. 7-13. Mr. Kunin offered no opinion as to whether prosecution laches should be applied to Mr. Hyatt's cases.

At the close of the PTO's case-in-chief, Hyatt moved for judgment pursuant to Federal Rule of Civil Procedure 52(c). Hyatt argued four bases for his motion: 1) the PTO did not prove that it provided Mr. Hyatt with adequate warnings of impending laches rejections; 2) the PTO failed to prove any intervening rights of third-parties in the technologies claimed in the present applications; 3) although the PTO may issue laches rejections, no such rejections are at issue in these cases and the Patent Act displaced the equitable remedy of prosecution laches in the context of a §145 action; and 4) assuming that an affirmative defense of prosecution laches is available in a §145 action, the PTO failed to meet its burden of proving unreasonable and unexplained delay.

Upon consideration of the evidence and arguments presented during trial and the entire records in these cases, and review of the relevant case law, the Court found the PTO failed to prove unreasonable and unexplained delay that supports a finding of prosecution laches, and accordingly granted Mr. Hyatt's motion on his fourth proffered ground. The present opinion, including the Court's findings and conclusions, is issued pursuant to Federal Rule of Civil Procedure 52(a)(1).[6]

## II.    LEGAL STANDARD

### a.  Rule 52(c)

Federal Rule of Civil Procedure 52(c) permits the Court to enter judgment against a party fully heard "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). In determining a Rule 52(c)

---

[6] In a separate Order, the Court granted PTO's Motion for Leave to File its Corrected Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law [ECF No. 214]. The Court therefore treats ECF No. 214-1 as the PTO's operative Responsive filing.

motion, "a district court may not draw any special inferences in favor of the non-movant." *Burke v. Record Press, Inc.*, 951 F.Supp.2d 26, 31 (D.D.C. 2013). However, if the party with the burden of proof has failed to meet that burden by the conclusion of its case-in-chief, the district court is to grant the motion against it. *Cf. id.*

### b. **Patent Prosecution Laches**

Although the government has asserted prosecution laches administratively, *see, e.g., In re Bogese*, 303 F.3d 1362 (Fed. Cir. 2002), and both the government and private party litigants have done so in, *e.g.*, infringement actions, *see, e.g., Woodbridge v. United States*, 263 U.S. 50 (1923); *Symbol Techs. I*, 277 F.3d 1361 (Fed. Cir. 2002), these four cases are the first in which the PTO has asserted prosecution laches in actions before a district court under 35 U.S.C. §145. "Prosecution laches is an equitable defense." *Cancer Research Tech. Ltd. V. Barr Labs., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010).[7] In its traditional articulation, the doctrine stands for the proposition that an already issued patent "may be rendered unenforceable if it was obtained after an unreasonable and unexplained delay in prosecution." *In re Bogese*, 303 F.3d at 1367 (citing *Symbol Techs. I*, 277 F.3d at 1365-66).

A pair of Federal Circuit opinions in 2002 concerning prosecution laches, and a 2012 Supreme Court case articulating district courts' duties under §145, *Kappos v. Hyatt*, 566 U.S. 431 (2012), make clear the Court can consider the PTO's affirmative defense of prosecution laches here, where the PTO has issued neither a patent nor any laches warnings. In *Symbol Techs. I*, the Federal Circuit upheld a district court's authority to find prosecution laches in an infringement case. Soon thereafter, that court affirmed the PTO's authority to assert prosecution laches as a

---

[7] This differs from standard laches, which "is an affirmative defense rather than a claim for equitable relief." *See Foster*, 733 F.2d at 90.

6

basis for rejecting a patent application. *See In re Bogese*, 303 F.3d at 1367. Because the PTO is empowered to assert prosecution laches administratively, and because litigants may assert the same before district courts, the affirmative defense ought also be available to the PTO in a §145 action. *Cf. id.* ("[W]e see no basis for denying the power to the PTO itself that we have recognized exists in the district courts in infringement actions. It necessarily follows that the PTO has the authority to reject patent applications for patents that would be [otherwise unenforceable].").

Further, under the Supreme Court's ruling in *Kappos v. Hyatt*,[8] district courts can consider new evidence not in the administrative record before the PTO from prosecution of a §145 plaintiff's antecedent patent application, and "the district court must make a *de novo* finding when new evidence is presented on a disputed question of fact." 566 U.S. at 434. This mandate for *de novo* findings likewise opens the door to new arguments concerning the evidence in the case, and just as the PTO can accordingly raise new grounds for rejecting a §145 plaintiff's claims on the merits in response to new evidence presented as to those claims, so too can the PTO raise an affirmative defense for the district court to consider. *See also Troy v. Samson Mfctrn'g Corp.*, 758 F.3d 1322 (Fed. Cir. 2014) (holding that, under *Kappos v. Hyatt*, new issues and arguments may be presented to district courts in §145 and §146 actions). In that vein, the Court here exercised its discretion to allow the PTO to amend its Answer to include an affirmative defense of prosecution laches. ECF No. 122.

Although there is no case directly on-point regarding how a district court should analyze prosecution laches as an affirmative defense in a §145 case, the contours of the doctrine previously articulated in infringement suits and in reviews of agency administrative actions, are instructive. "The doctrine [of prosecution laches] should be applied only in egregious cases of misuse of the

---

[8] Mr. Hyatt's application that gave rise to the *Kappos v. Hyatt* decision, 08/471,702, first litigated in this court, 09-cv-901, has origins and ancestry largely in common with the applications at issue here.

7

statutory patent system." *Symbol Technologies, Inc. v. Lemelson Medical*, 422 F.3d 1378, 1385 (Fed. Cir. 2005) (*Symbol Techs. II*). In other situations not involving *prosecution* laches, the Federal Circuit has cautioned, "The mere passage of time does not constitute laches." *Advanced Cardiovascular Systems v. Scimed Life Systems*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). The Supreme Court has held the same. *United States v. American Bell Tel. Co.*, 167 U.S. 224, 246 (1897) ("The mere fact of delay does not, therefore, operate to deprive the inventor of his legal rights."). Indeed, lengthy patent application prosecutions have been held not to implicate prosecution laches in many cases. *See, e.g., Cancer Research*, 625 F.3d at 728 (reversing finding of prosecution laches, despite "eleven continuation applications, ten abandonments, and no substantive prosecution for nearly a decade"); *Studiengesellschaft Kohle mbH v. Northern Petrochem. Co.*, 784 F.2d 351, 352 (Fed. Cir. 1986) (per curium) (affirming district court's finding of no laches despite prosecution period that lasted over twenty years); *Regents of the Univ. of Cal. v. Monsanto Co.*, 2005 WL 3454107, *25–26 (N.D. Cal. 2005) (finding the doctrine of prosecution laches inapplicable despite the fact that twenty-four years had passed between the application filing and patent issue); *Koninklijke Philips Electronics N.V. v. Cinram Intern., Inc.*, 2012 WL 4074419, *7 (S.D.N.Y. 2012) (prosecution laches inapplicable despite nearly 19 years between the application filing and patent issue dates).

Rather than merely calculating the passage of time, delay must be unreasonable and unexplained. To determine this, courts are to look to "the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims." *Symbol Techs. II,* 422 F.3d at 1386. Further, prosecution laches principally looks to a patent applicant's conduct, not his intent; although evidence that an applicant intended to delay issuance of a patent can be relevant, the absence of such intent does not forgive conduct that does, in fact

8

unreasonably and inexplicably delay examination of his application(s). *See, e.g., Woodbridge*, 263 U.S. at 56 ("This is not a case where evidence has to be weighed as to the purpose of the inventor.").

Finally, whereas in an action between private parties a court will balance equities in its analysis, *see Symbol Techs. II*, 422 F.3d at 1385, the Federal Circuit has elsewhere determined that "a delay by the PTO cannot excuse the applicant's own delay." *See In re Bogese*, 303 F.3d 1362, 1369 (Fed. Cir. 2002). It is significant that each of those matters is somewhat distinct from the instant cases in their present posture. The *Symbol Techs.* cases involved private parties litigating issued patents, and in *Bogese* the Federal Circuit was reviewing an appeal from the Board's upholding administratively-issued prosecution laches rejections on an arbitrary and capricious standard.

In a §145 action where the district court is making a *de novo* determination on the evidentiary record before it and not the administrative record of the PTO, its review of the propriety of applicants' prosecution conduct in a §145 action is not done in light of any presumptions as to the validity of PTO's earlier actions. To the contrary, the same ground from which this Court derives authority to entertain the PTO's equity-based affirmative defense in the first instance, *i.e.*, PTO's broader administrative authority to reject patent applications, is relevant to an equitable inquiry that necessarily concerns, in part, PTO's failure or otherwise declining to exercise that authority earlier. An adapted standard is therefore appropriate where, as here, a district court is conducting a *de novo* analysis of PTO's *ex-post* assertion of prosecution laches during litigation, as opposed to during examination in which an applicant may have an opportunity to cure the alleged inequitable conduct in response to an agency's action or warning. While it remains that any delay by the PTO does not excuse any unreasonable and unexplained delay by the applicant,

9

under the totality of the circumstances test PTO's actions and omissions can likewise be considered in determining the reasonableness of any delay actually attributable to the applicant, and the applicant's explanations therefor.

## III. ANALYSIS

The PTO accuses Mr. Hyatt of inequitable prosecution conduct that caused unreasonable and unexplained delay in the examination of his applications. PTO argues, *inter alia*, that the following alleged factors contributed to unreasonable delay in examination: 1) the large number of claims in and across Mr. Hyatt's applications; 2) his amendment practice; 3) his alleged shifting of claims; 4) numerous and complicated priority claims in Mr. Hyatt's applications, including that the claims of priority made it difficult for examiners to identify written description support; 5) difficulties in identifying written description support for Mr. Hyatt's claims due to challenges in identifying priority dates for claims, the length of the applications, the incorporation by reference of other applications, and unclear interconnections among claim elements; 6) double-patenting, duplicate claims, and indistinct claims across the applications, including overlaps with claims in applications pending before the Court; 7) prosecution of claims previously allowed in another application (06/663,094, referred to as 'the '094 application'); 8) reintroducing certain claims previously lost in interference actions; and 9) delay in presenting the claims contained in his 1995 pre-GATT applications, including the four applications pending before this Court, which claim priority to earlier-filed applications.

The Court does not doubt that Mr. Hyatt's "GATT Bubble" applications (*i.e.*, those filed in the spring of 1995) have menaced the PTO for decades. They are long, highly technical, and voluminous. But also true, and particularly telling for present purposes, is that many of Mr. Hyatt's

applications spent an inordinate time in a proverbial Never-Never Land, during which he was not allowed under PTO's procedures to prosecute his applications further, until the PTO took certain actions. As detailed further below and as PTO concedes, ECF No. 214-1 at *29, at least a nine-year period thus does not factor into the Court's laches analysis.

Unsurprisingly, the PTO's approach at trial tracked very closely with its earlier motions to dismiss for prosecution laches. ECF No. 91 (05-cv-2310); ECF No. 91 (09-cv-1864); ECF No. 94 (09-1869); ECF No. 93 (09-cv-1872). For example, the PTO spent most of its presentation addressing facts concerning Mr. Hyatt's approximately 400 applications not otherwise implicated in the four cases before this Court, with a particular and peculiar emphasis on prosecution conduct related to those applications that post-date the filing of the present actions in district court. The obvious rationale for the PTO's doing so is that PTO apparently understands the Federal Circuit's totality test to include consideration of all prosecution conduct as to all related applications, without temporal or procedural limitation.[9] But, for reasons explained below, that sweeping construction cannot reasonably be applied to these cases. The PTO also relies upon representations allegedly made at a meeting with Mr. Hyatt in 1995, but does not adequately establish a corresponding duty by Mr. Hyatt to ease PTO's burden as a result of that meeting. These and other factors are detailed in the Court's findings and conclusions below.

### a. Findings of Fact

**The Nature of the Cases and Mr. Hyatt's Applications**

Each of the applications at issue in these cases was filed before June 8, 1995, the effective date of the law that changed the term of a patent from 17 years after issuance to 20 years from the

---

[9] At the same time, however, the PTO objects to this Court making any findings as to those other 400 applications that are not the subject to any of the four actions here. *See, e.g.*, ECF no. 214-1 at *3, *16. This desire for the Court to consider but not decide matters not directly before it permeated PTO's entire litigation strategy.

application date of the oldest application from which the application claims priority. This change in the U.S. patent term was part of the implementation of the Uruguay Round of the General Agreement on Tariff and Trade ("GATT"). See Trial Tr. 43:8–44:3 (Oct. 6, 2017 P.M. Session); 20:6–14 (Oct. 10, 2017 P.M. Session).

To address circumstances where an applicant had the right under U.S. patent law to file a new patent application to pursue claims described in a specification that had already been filed with the PTO (known as a "continuing application"), Congress required the PTO to promulgate rules to provide applicants further examination of additional patent claims that claim priority from pre-GATT applications without loss of patent term. Pub. L. No. 103-465, sec. 532(a)(1), § 532(a)(2), 108 Stat. 4809, 4984 (1994) (codified as amended at 35 U.S.C. § 154). The PTO's rule implementing this legislation is in 37 C.F.R. § 1.129 ("Rule 129"), which was promulgated on April 25, 1995. See 60 Fed. Reg. 20,195, 20,226–27 (Apr. 25, 1995) ("Changes to Implement 20-Year Patent Term and Provisional Applications"); *see also* Trial Tr. 45:18–47:9 (Oct. 6, 2017 P.M. Session) (addressing Rule 129).

To preserve the opportunity to obtain a 17-year term for patents based on pre-GATT applications, many applicants filed a large number of patent applications during the brief period between the promulgation of Rule 129 in April 1995 and the date on which the new patent term law went into effect, June 8, 1995. The surge in applications filed during this period is known as the "GATT Bubble." Trial Tr. 104:17–107:21 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt's GATT Bubble applications filed in 1995, including the four applications pending before the Court, were continuing applications that claim the benefit of earlier-filed parent applications under 35 U.S.C. § 120. Their claims also claim the benefit of the date of the earliest-filed parent application whose specification provides support for the claims.

12

Mr. Hyatt's GATT Bubble applications differed in number and size from those filed by most other applicants. Mr. Hyatt filed many more applications, with much longer specifications, and many more claims, than most other applicants. The number, volume, length, and complexity of Mr. Hyatt's applications are not ordinary.

Mr. Hyatt's patent applications, including the four applications pending before the Court, contain lengthy and detailed disclosures, including specifications. The 700-family specification, which forms the basis of the '211 and '398 applications, is comprised of 576 pages of text and 65 pages of figures. PTX-001.05255–5830; PTX-001.05840–905. The 500-family specification, which forms the basis of the '062 application, is comprised of 238 pages and 40 pages of figures. PTX-002.01183–1458. The 600-family specification, which forms the basis of the '639 application, is comprised of 518 pages and 46 pages of figures. PTX-003.01333–1896. "Typical" specifications are 20 or 30 pages. Trial Tr. 23:16 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt's applications, including the four applications pending before the Court, contain unusually large sets of claims. Trial Tr. 79:10–11 (Oct. 10, 2017 P.M. Session) ("[I]t was extremely unusual. I can recall one case that had approximately that number of claims."). The four applications before this Court presented a total of approximately 1,592 claims, including claims that were subsequently canceled by Mr. Hyatt. Trial Tr. 50:6–20 (Oct. 12, 2017 P.M. Session). Across Mr. Hyatt's approximately 400 applications pending before the PTO in 2003, those applications presented a total of approximately 115,000 claims, or on average approximately 300 claims per application. Trial Tr. 68:19–70:9 (Oct. 10, 2017 P.M. Session).

A PTO study of patent applications filed between 1995 and 2013 reveals that the "typical application" contained 20 claims at the time it was filed. Trial Tr. 78:22–81:19 (Oct. 6, 2017 A.M. Session); 74:2–8 (Oct. 10, 2017 P.M. Session); DX 251. A typical examiner on average is allotted

13

about 20 hours to examine 20 claims. Only 0.02% of all applications filed included more than 299 claims. *See* DX1486 ¶ 162.

The largest technology companies filing GATT Bubble applications did not engage in the same examinational behavior as Mr. Hyatt engaged in. *See, e.g.,* Trial Tr. Day 4 P.M. Session, 29:17-31:15 (describing how 10 large companies filed pre-GATT applications with only 17.7 claims per application, as opposed to Mr. Hyatt's average of 299 claims per application), 55:17-25, Oct. 10, 2017.

The cases before the Court were filed in 2005 and 2009. In accord with a PTO stipulation, *see, e.g.*, 214-1 at *29, the years 2003-2012, a period in which PTO suspended examination of the majority of Mr. Hyatt's applications, is not considered in the present analysis. PTO restarted examination of Mr. Hyatt's remaining applications in 2013. PTO began issuing Requirements that included prosecution laches warnings beginning in April 2015.[10]

**The Four Applications Before the Court**

The '211 Application (Case no. 05-cv-2310)

Mr. Hyatt filed the '211 application on June 1, 1995. PTX-004.07554. The '211 application is a continuation of patent application serial number 07/289,355, filed December 22, 1988, which is a continuation of patent application serial number 06/663,094, filed October 19, 1984. PTX-004.07555. The PTO entered a non-final Office Action rejecting the claims on

---

[10] During oral arguments before the Federal Circuit in *Hyatt v. Lee*, 797 F.3d 1374 (Fed. Cir. 2015), Judge Moore asked Government counsel, "How could there be 115,000 claims that were filed prior to June 8, 1995, that are still kicking around? . . . . If Mr. Hyatt is responsible . . . why aren't you nailing him to the wall with prosecution laches? We handed it to you – why aren't you using it?" *See* oral arg., dkt. 2014-1596, May 6, 2015 40:06 – 44:09. Presumably, Judge Moore was referring to *Bogese* in 2002. PTO issued its first prosecution laches warning in one of Mr. Hyatt's applications nineteen days before that exchange. After oral arguments and up through its filing of its Motion for Leave to file its Motion to Dismiss for Prosecution Laches in this Court on September 30, 2016, PTO issued fifty-one additional warnings. *See* ECF 81-2 at *21-22.

September 22, 1995, and entered a final rejection made on July 31, 1996. PTX-087.00004. Mr. Hyatt, using the transitional rules provided in 37 C.F.R. § 1.129(a) ("Rule 129(a)"), petitioned to file an amendment, the effective equivalent of a continuing application, on March 25, 1997. PTX-004.06587–89. The PTO issued a non-final Office Action rejecting the claims on August 3, 1998. PTX-087.00004. The PTO entered a final rejection of the claims on August 27, 1999. PTX-087.00003; Trial Tr. 30:12–31:18 (Oct. 11, 2017 P.M. Session). Prosecution concluded in just over four years, when the PTO issued a final rejection from which Mr. Hyatt appealed. PTX-087 (PALM record).

Having been twice rejected, the '211 claims were eligible for an appeal to the Board. *E.g.*, Trial Tr. 6:16–20 (Oct. 13, 2017 P.M. Session); 35 U.S.C. § 134(a). Mr. Hyatt timely noticed his appeal to the Board on February 28, 2000, and he filed his appeal brief on August 28, 2000. PTX-087.00003; Trial Tr. 30:12–31:18 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and subsequent motion for reconsideration, the Board reversed several rejections by the examiner of the '211 application claims, ending the PTO's administrative adjudication of the '211 application on September 21, 2005. PTX-087.00006. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims in the '211 application on which the Board affirmed at least one ground of rejection on November 18, 2005. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

The '398 Application (Case no. 09-cv-1864)

Mr. Hyatt filed the '398 application on June 1, 1995. PTX-001.05921. The '398 application is a continuation of patent application serial number 07/289,355, filed December 22, 1988, which is a continuation of patent application serial number 06/663,094, filed October 19, 1984. PTX-001.05921; *see* PTX-004.07555. The PTO entered a non-final Office Action rejecting

15

the claims on September 19, 1995, and a final rejection on August 9, 1996. PTX-001.05184; PTX-001.05137. Mr. Hyatt petitioned to enter a submission pursuant to 37 C.F.R. § 1.129(a) with an amendment, effectively equivalent to a continuation application; the PTO subsequently rejected the then-pending claims in a non-final Office Action on December 12, 2000. PTX-001.04812; PTX-001.04505–06. Mr. Hyatt amended the claims on January 30, 2002. PTX-001.04268–69. On July 31, 2002, January 23, 2003, and August 18, 2003, the PTO suspended prosecution in the '398 application for a cumulative total of twenty months ending on February 18, 2004. PTX-001.04255–57; PTX-001.04246–48; PTX-001.04211–13; Trial Tr. 31:20–33:13 (Oct. 11, 2017 P.M. Session). The PTO issued a non-final Office Action on September 7, 2004. PTX-001.04025-26; Trial Tr. 33:6–34:7 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on March 7, 2005. PTX-001.03898. He filed his appeal brief on August 26, 2005, thereby closing prosecution. PTX-001.00928; Trial Tr. 34:14–25 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and subsequent two motions for reconsideration, the Board reversed numerous grounds of rejection found by the examiner of the '398 claims, concluding the PTO's administrative adjudication of the '398 application on July 8, 2009. PTX-086.00007. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

The '062 Application (Case no. 09-cv-1869)

Mr. Hyatt filed the '062 application on June 6, 1995. PTX-002.1223. The '062 application is a continuation of patent application serial number 06/661,649, filed October 17, 1984, through

16

several other continuation applications. PTX-002.1224. The PTO entered a non-final Office Action rejecting the claims on September 18, 1995, and another non-final Office Action rejecting the claims in full on June 26, 1996. PTX-088.00004. After Mr. Hyatt amended his claims, the PTO entered a final rejection on October 16, 1997. PTX-088.00003. It therefore took the PTO approximately two years and four months to issue the final rejection of Mr. Hyatt's claims from which he appealed. Trial Tr. 25:7–26:5 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on or around March 4, 1998. PTX-002.00891; PTX-088.00006. He filed his appeal brief on September 3, 1998. PTX-002.00557; Trial Tr. 25:7–26:22 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and three subsequent motions for reconsideration, the Board reversed numerous rejections by the examiner of the '062 claims, concluding the PTO's administrative adjudication of the '062 application on July 8, 2009. PTX-088.0006. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

The '639 Application (Case no. 09-cv-1872)

Mr. Hyatt filed the '639 application on May 1, 1995. The '639 application is a continuation application of patent application serial number 07/279,592, filed December 2, 1988. PTX-003.01380. The PTO entered a restriction requirement requiring Mr. Hyatt to elect one group of claims for examination drawn to one invention on October 19, 1995. PTX-003.01311–13. On July 24, 1996, the PTO rejected the claims in a non-final Office Action. PTX-085.00005. The PTO rejected the claims in a final Office Action dated May 19, 1999. PTX-085.00005. It therefore took the PTO just over four years from the filing of the '639 application to issue the final rejection

17

from which Mr. Hyatt appealed to the Board. Mr. Hyatt timely noticed his appeal on October 19, 1999. PTX-085.00005.

Mr. Hyatt filed his Appeal Brief on April 18, 2000, thereby closing prosecution. PTX-085.00005; Trial Tr. 28:2–29:15.7. In the course of its decisions on Mr. Hyatt's appeal and three subsequent motions for reconsideration, the Board reversed numerous rejections by the examiner of the '639 claims, concluding the PTO's administrative adjudication of the '639 application on July 8, 2009. PTX-085.00005. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

**PTO's Examination Policy and Practice**

PTO's longstanding policy is to engage in "compact prosecution." The goal of compact prosecution is for the examiner to raise every noncumulative ground of rejection or objection that the examiner finds to exist in one office action. *See* Trial Tr. 8:22-9:11; 84:17-85:7 (Oct. 6, 2017 P.M. Session). In general, the practice and policy of compact prosecution is prudent for PTO and patent applicants alike, with the aim of resolving applications as quickly as possible. Trial Tr. 85:8-86:1.

Patent applicants have discretion as to how to prosecute their claims within the PTO's rules and regulations. The PTO has several legal authorities to regulate inequitable applicant conduct during the examination process. These include undue multiplicity rejections, PTO's Rule 11.18, and 37 C.F.R. §1.145. PTO policy is that, absent entry of a restriction requirement, undue multiplicity rejection, or prosecution laches rejection, applicants are entitled to an examination of

18

the claims presented in a single application, including claims directed to multiple inventions, provided the applicant pays the required fees and complies with the patent statutes. Trial Tr. 15:13–18 (Oct. 10, 2017 A.M. Session); 16:8–22 (Oct. 10, 2017 A.M. Session); 65:14–23 (Oct. 13, 2017 A.M. Session); *see also* Trial Tr. 78:24–79:3 (Oct. 10, 2017 P.M. Session) ("There is no limit to what can be presented.").

Applicants pay for every independent claim in excess of three and for every claim in excess of 20 total claims in accordance with fee schedules set by the Government. Trial Tr. 16:23–17:11 (Oct. 10, 2017 A.M. Session). Mr. Hyatt has paid more than $7,000,000 in fees to the PTO in recent years to have his applications and claims examined. PTX-099; Trial Tr. 17:2–19 (Oct. 10, 2017 AM Session); 65:9–12 (Oct. 11, 2017 P.M. Session). The PTO's accounting is that Mr. Hyatt paid only approximately $59 per claim, in light of the fact that an examiner on average was allotted about 20 hours to examine 20 claims. *See* Trial Tr. Day 1 P.M. Session, 31:4-14, 4:9-16, Oct. 6, 2017; Trial Tr. Day 1 A.M. Session, 89:17-20, Oct. 6, 2017. In the past 5 years, the PTO has paid over $10 million to examine Mr. Hyatt's claims. *See* Trial Tr. Day 4 A.M. Session, 57:1-16, Oct. 12, 2017.

The time a patent application is pending in the PTO can vary based on factors intrinsic and extrinsic to the application. Intrinsic factors might include: the number of claims presented for examination, the claim amendment practice, claim "shifting," entitlement to priority and benefit sought by the applicant, written description support issues, double-patenting issues, and other discrete issues raised by the patent office. *See* Trial Tr. 4:6–7:3 (Oct. 12, 2017 P.M. Session). Extrinsic factors generally relate to PTO's workload and allocation of resources, but also can include an applicant's willingness to cooperate with PTO examiners' informal requests during the examination process.

If an applicant wants to show entitlement to the right of priority to establish an earlier effective filing date as against intervening prior art, it is the applicant's burden to establish that right of priority. *See* Trial Tr. 23:20–24:7 (Oct. 13, 2017 P.M. Session).

Under 35 U.S.C. § 112(1), the test for whether a specification contains an adequate written description of the subject matter claimed in a patent application is whether it enables any person with ordinary skill in the art to make and use the invention. Trial Tr. 22:9–14 (Oct. 10, 2017 P.M. Session). That is a legal determination regularly made in patent application examination. Written description rejections are "fairly common" in PTO practice, with numerous court decisions and specific PTO guidelines addressing such issues. Trial Tr. 97:11–99:5 (Oct. 6, 2017 P.M. Session); 23:4–15 (Oct. 13, 2017 P.M. Session). The PTO can and does address claims that it contends lacks written description support through written description rejections. Trial Tr. 97:11–99:10 (Oct. 6, 2017 P.M. Session); 23:4–24:12 (Oct. 13, 2017 P.M. Session). Should the examiner make a written description rejection, the application must then demonstrate that there is adequate written description support for the claims.

Double patenting is relevant to examination to avoid issuing a claim that is substantially similar to another claim that is also under examination and may be subject to a rejection that would be relevant to the other pending claim. The PTO attempts to police double-patenting issues during examination, and issues provisional double-patenting rejections to which applicants respond, when those issues arise in two (or more) pending applications. *See, e.g.*, Trial Tr. Day 1 P.M. Session, 92:5-17, Oct. 6, 2017; Trial Tr. Day 3 A.M. Session, 40:18-41:4, Oct. 11, 2017; Trial Tr. Day 4 A.M. Session, 44:19-45-17, Oct. 12, 2017. Double patenting rejections "may be deferred until allowable subject matter has been indicated. At that time, the allowed claims should be reviewed against all related application claims for any double patenting issues." PTX-003.00970.

Patent applicants are entitled to traverse rejections, including challenging those decisions before the Board and/or in the courts. Patent applicants are entitled to amend or cancel claims to avoid a ground of rejection.

After a patent application is filed, further mandatory action on the part of the applicant can only be triggered by formal means in accord with PTO regulations.

**Examination and Prosecution of Mr. Hyatt's Applications**

Despite being 3,000 pages long, the PTO's Manual of Patent Examining Procedure does not cover a case such as Mr. Hyatt's. The PTO could not practice its typical and preferred mode of compact prosecution of Mr. Hyatt's claims across 400 lengthy applications. The PTO's policy of compact prosecution made it impossible to complete examination of Mr. Hyatt's applications in its desired manner under the time typically given to examiners. Mr. Hyatt's applications could not be treated as typical applications given their size and scope. *See* ECF No. 214-1 at *9 ("the evidence showed that the applications could not be treated as typical applications given their size and scope") (*citing* Trial Tr. Day 2 A.M. Session, 75:14-77:15, Oct. 10, 2017); *id.* at *30 ("all agree that Mr. Hyatt's applications are far from typical"). The PTO has conceded that it could not engage in compact prosecution with respect to Mr. Hyatt's applications, given their unusual characteristics. *See* ECF no. 214-1 at *8.

Mr. Hyatt attended a meeting in October 1995 with Nicholas Godici, a former PTO group Director, during which they discussed focusing each of his applications on different subject matter. Trial Tr. 54:10–65:3 (Oct. 10, 2017 P.M. Session). At the meeting, Mr. Hyatt agreed to "focus" his claims by increasing the demarcation between applications. Trial Tr. 69:14–70:9 (Oct. 10, 2017 P.M. Session). Neither Mr. Godici nor Mr. Hyatt memorialized the purported agreement in an interview summary, even though doing so is required by PTO rules. Trial Tr. 53:17–20 (Oct.

11, 2017 P.M. Session); 14:4–15:1 (Oct. 6, 2017 P.M. Session); 12:25–13:20 (Oct. 10, 2017 A.M. Session). Despite those formal rules, conversations between applicants and examiners, never mind Group Directors like Mr. Godici, are not always memorialized in interview summaries. Trial Tr. Day 2 A.M. Session, 62:10-16, Oct. 10, 2017.

After his conversation with Mr. Godici, Mr. Hyatt proceeded to file petitions to enter amendments in some of his applications. Trial Tr. 53:1–13 (Oct. 11, 2017 P.M. Session). A number of those petitions were denied by Mr. Godici. Trial Tr. 54:3–56:12 (Oct. 11, 2017 P.M. Session); PTX-051; PTX-052. After the October 1995 meeting, the PTO continued examining Mr. Hyatt's applications, rather than make rejections on procedural grounds.

Mr. Hyatt never "focused" his claims in accordance with the informal agreement made during the October 1995 meeting. In 2015, Mr. Hyatt stated he never had a "master plan" to do so. *See* ECF 81-2 at *23; Trial Tr. 73:7-76:5 (Oct. 11, 2017 A.M. Session).

Mr. Hyatt has made numerous amendments to the claims in his applications, including the four applications pending before this Court. *See* Trial Tr. 68:19–70:9 (Oct. 10, 2017 P.M. Session) (contending Mr. Hyatt submitted 115,000 claims for examination via his amendments); 51:3–56:15 (Oct. 10, 2017 P.M. Session) (testifying regarding amendments in the four applications before the Court); *see also* PTX-001.05167; PTX-001.04951; PTX-001.04812; PTX-001.04268; PTX-002.01180; PTX-002.01102; PTX-002.01111; PTX-003.01314; PTX-003.01257; PTX-003.00990; PTX-004.06831; PTX-004.06716; PTX-004.06607; PTX-004.06309; PTX-004.05962; Trial Tr. 50:6–20 (Oct. 12, 2017 P.M. Session) (stating Mr. Hyatt submitted 1,592 claims for examination via amendments). Mr. Hyatt's amendments, in some instances, substantially rewrite claim language and add additional claims. *E.g.*, Trial Tr. 75:13–78:14 (Oct. 10, 2010 P.M. Session) (Morse testimony discussing amendment in the '211 application).

22

From approximately 1995 through 2003, the PTO issued numerous non-final and final Office Actions on the merits of Mr. Hyatt's patent applications. The PTO issued 13 of Mr. Hyatt's patent applications (between June 1995 and May 1997), and withdrew from issuance 4 applications. For approximately 100 of Mr. Hyatt's applications, the PTO issued rejections that Mr. Hyatt appealed (closing prosecution) and briefed before the Board. *See* PTX-005; PTX-019.00008–9; DX-254; DX-268.

Between approximately 2003 and 2012, 80 of Mr. Hyatt's pending applications were held by PTO in a proverbial Never-Never Land, with no Examiners' Answers filed that, under PTO regulations, were required to trigger Board consideration of Mr. Hyatt's appeals in those applications. PTO has stipulated that this period is not time that can be attributed to Mr. Hyatt's allegedly unreasonable and unexplained delay. *See, e.g.*, ECF No. 214-1 at *29.

The PTO did not issue any prosecution laches warnings as to any of Mr. Hyatt's pending applications prior to the commencement of litigation in these cases, although it had authority to do so if it had deemed his conduct so inequitable as to merit it.

The PTO did not reject any of Mr. Hyatt's pending claims under the doctrine of prosecution laches prior to the commencement of litigation in these cases, although it had authority to do so if it had deemed his conduct so inequitable as to merit it.

There is no record of the PTO invoking Rule 11.18 in these applications, nor did the PTO apply undue multiplicity rejections or deny entry of amendments in Mr. Hyatt's applications prior to 2013. More recently, the PTO has issued formal Requirements, laches warnings, and laches rejections as to several of Mr. Hyatt's applications not among the four directly at issue in this litigation.

23

The PTO did not issue any rejections or otherwise invoke 37 C.F.R. § 1.145 to refuse to enter any amendment prior to 2015. Trial Tr. 59:10–60:1 (Oct. 13, 2017 A.M. Session).

The PTO has shown evidence of so-called "claim shifting," or amending claims in a wholesale way as if to re-write them to refer to or reflect a different invention, without renumbering them, since the agency began issuing Requirements against Mr. Hyatt's remaining applications after reopening prosecution in 2013. *See, e.g.,* DX136 at *25-29. The alleged claim shifts in other applications identified by the PTO long postdate the close of prosecution at the PTO and this Court's assumption of jurisdiction over the four applications pending before the Court. *See* Trial Tr. 59:10–60:1 (Oct. 13, 2017 A.M. Session). The PTO has also shown evidence of amendments in the four applications before the Court that it considers to be unusual. *See* DX-050; DX-086; DX-090; DX-103; DX-108; DX-120; DX-208; DX-222; DX-267; Trial Tr. 74:14-91:11 (Oct. 10, 2017 P.M. Session).

The PTO experienced difficulty conducting double-patenting reviews of Mr. Hyatt's applications. Such reviews are typically done in accord with the agency's policy of compact prosecution.

The PTO allowed Mr. Hyatt's claims in 1989 in the '094 application, but Mr. Hyatt chose not to pay for issuance of those claims, and he re-submitted those claims in continuing application 07/289,355 (the '355 application). Trial Tr. 5:17–7:15 (Oct. 10, 2017 P.M. Session). The PTO's expert, Mr. Kunin, testified that Mr. Hyatt chose not to take the allowed claims in the '094 application because he wanted to submit additional prior art references via an Information Disclosure Statement; Mr. Hyatt's patent could have been rendered unenforceable if he had not done so. After allowance of the '094 claims, Mr. Hyatt was not entitled to receive consideration of the Information Disclosure Statement, so he filed a continuation application to have that

Information Disclosure Statement considered. Trial Tr. 52:7–59:9 (Oct. 13, 2017 A.M. Session). Prior to 1995, it was common for applicants to file a continuation application to obtain consideration of prior art references. Trial Tr. 52:7–59:9 (Oct. 13, 2017 A.M. Session). Ultimately, the previously-allowed claims were subjected to a restriction requirement in the '355 application, and Mr. Hyatt elected to proceed with a different invention in the '355 application. *See* Trial Tr. 42:10–11 (Oct. 12, 2017 P.M. Session).

Mr. Hyatt presented at least one claim in an application that he had previously lost in an interference proceeding regarding the single-chip microprocessor. *See* Trial Tr. 9:5–15:2 (Oct. 11, 2017 P.M. Session); 47:8–24 (Oct. 12, 2017 P.M. Session); 4:15–24 (Oct. 13, 2017 P.M. Session). The PTO has methods to address any claims it contends were lost in interference: it can issue an interference estoppel rejection. *See* Trial Tr. 45:3–47:6 (Oct. 12, 2017 P.M. Session). Mr. Hyatt canceled one claim the PTO contends was lost in an interference. Trial Tr. 4:15–5:13 (Oct. 13, 2017 P.M. Session) (addressing cancellation of claim 186 in the '879 application). While the USPTO can issue an interference estoppel rejection, it would have facilitated examination for Mr. Hyatt not to introduce claims that he lost in an interference.

During the pendency of these four cases before the Court, the Court has never issued an Order to Show Cause why any of these cases should not be dismissed for failure to prosecute.

### b. Conclusions of Law

Prosecution laches is an issue "to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised." *Symbol Techs., II*, 422 F.3d at, 1385. As it is the party asserting the affirmative defense, the PTO bears the burden of proof and persuasion. *See, e.g., Brunswick Bank & Tr. Co. v. United States*, 707 F.2d 1355, 1360 (Fed. Cir. 1983) ("the party

raising an affirmative defense has the burden of proof on the issue."). The parties dispute the level of that burden. These actions under §145 are civil matters in which the Court is making *de novo* findings on patentability for the claims for which new evidence is presented. The burden of proof on the merits of these actions is thus on the applicant-plaintiff to establish by a preponderance of the evidence that he is entitled to a patent on those claims. *See generally SD3, LLC v. Lee*, 205 F.Supp.3d 37 (D.D.C. 2016) (making findings by a preponderance). Even though Administrative Procedure Act deference may be appropriate regarding claims for which the plaintiff has not offered new evidence, this Court will assume and apply a preponderance standard to PTO's affirmative defense for the simple reason that, if it can prove by a preponderance that it is entitled to dismissal of these actions, then it is necessarily the case that Mr. Hyatt cannot, in turn, meet his burden that he is entitled to the relief he seeks. Assuming that the preponderance standard applies, PTO has not met its burden here.

## The Relevant Period, and Related Patent Applications

In their most simplistic forms, the parties' arguments boil down to this: the PTO says Mr. Hyatt's applications should be denied for prosecution laches because his conduct across all 400 of his applications from the filing of their parent applications through today unreasonably and inexplicably delayed examination. Hyatt, on the other hand, wishes the Court to determine he did not commit prosecution laches because the examination of the four applications before the Court concluded in a timely manner. As is often the case in litigation, and especially in cases of first-impression, neither side is spot-on.

Although determining whether the four applications before the court ought to be dismissed for prosecution laches takes into account the applicant's conduct in his related applications, that totality principle does not apply in a manner as to require this Court to account for the entirety of

26

the prosecution history of each related application from its inception to final disposition. Transactions or occurrences that take on special legal significance in any one application may operate prospectively to remove the subject application from the prosecution laches calculus. An applicant's filing of a §145 action in district court is such an occurrence, as it initiates a wholly different set of obligations on behalf of both the applicant-plaintiff and the examining agency-defendant than those that pre-existed the court action. Therefore, Mr. Hyatt's general prosecution conduct across his remaining factually (though no longer legally) related applications to the ones before the Court, which post-dates his filing of the §145 actions at-issue here, is only relevant insofar as it might demonstrate circumstantially something about Mr. Hyatt's conduct across all related applications before these four cases were filed in 2005 and 2009.

Because the PTO stipulates that the period between 2003 and 2012 ought not be considered in the Court's prosecution laches analysis, *see, e.g.*, 214-1 at \*29, and because by 2012 these matters were already subject to litigation in this Court, the Court, is left only to consider Mr. Hyatt's prosecution conduct up through 2002. The PTO's stipulation functions as an admission that the PTO shoulders responsibility for the delay during that period. That nearly decade-long delay by the PTO, and any other delay that might be attributable to the agency, is not directly relevant to the applicant's delay. *See Bogese,* 303 F.3d at 1369. Mr. Hyatt could not, for example, elect to delay his prosecution because the PTO had first delayed in processing or examining his applications. There is no tit-for-tat in the examination and prosecution process. But the question before the court is whether Mr. Hyatt engaged in *unreasonable* and unexplained delay. The very totality test that PTO wishes to leverage in its favor similarly functions such that, whether Mr. Hyatt's delay is unreasonable is not wholly divorced from the greater context of his interactions with PTO, and the agency's actions or failures to act, of which the near-decade of suspended

27

examination is but one example.

Although the PTO wishes to restart the clock once more after 2012, the cases before the Court had been filed years earlier. Any delay in prosecuting the §145 litigation was within the power of the Court to enforce,[11] and the relevance of any post-2012 delays in prosecuting the other 400 applications not at-issue in these cases is so circumspect that the Court must decline to consider it here.[12] In other words, even in light of the totality of the circumstances test applicable in prosecution laches cases, this Court ascribes no weight to the subsequent prosecution history of other applications not before the Court following the onset of litigation in these matters.

A Unique and Extraordinary Circumstance

In its objections to Mr. Hyatt's proposed findings and conclusions, PTO repeatedly refers to its typical procedures, while at the same time grounding its case in how unusual Mr. Hyatt's applications were and are. For example, PTO explains that it "did not make all applicable rejections to Mr. Hyatt's claims because it would have been impossible to do so under the time typically given to examiners." ECF 214-1 at *7 (regarding proposed findings 20-22). *See also id.* at, *e.g.,* *9 (regarding proposed findings 52-53); *12 (regarding proposed findings 62 and 66); *16 (regarding proposed finding 81); *17 (regarding proposed findings 93-94); *25 (regarding

---

[11] A plaintiff's "prosecution" of his civil action in district court is a different use of the word than that implied by administrative patent "prosecution." Though the homonyms are even thematically similar, they entail different duties and procedures and, without more, do not compound each other for the purposes of this analysis.

[12] The PTO tries mightily to avoid the necessary inference that the relevance of such later conduct lies in how it might relate back to Mr. Hyatt's intent and strategy from the start. As noted *supra*, this Court construes the supposed irrelevance of intent in prosecutions laches to be limited to the irrelevance of a *lack* of evidence of intent on the part of the applicant to delay examination; an established intention on the part of the applicant to delay issuance of his patents, however, can be grounds not to issue them. *Compare Symbol Techs. II*, 422 F.3d at 1382, 1384, *with Woodbridge*, 263 U.S. at 56-62 (discussing indicia of deliberateness, willfulness, and intent). The closest evidence PTO presented that could be construed as evidence of Mr. Hyatt intending to delay is his lack of a "master plan" to cooperate with examiners. As explained further below, especially in light of the PTO's own inaction to exercise formally any of its authorities to require further action from Mr. Hyatt on his applications undergoing examination, this is insufficient for the Court to draw an inference warranting dismissal of Mr. Hyatt's applications at this stage based on his prosecution conduct between 1995 and 2003.

proposed findings 118-121).[13] And yet, PTO explains, "it is not disputed, and in fact is judicially recognized, that Mr. Hyatt's applications are not ordinary, and that ordinary rejections and complete examination could not be made with respect to his claims given," for example, the applications' complexity. *Id.* at *21. *See also, e.g., id.* at *32 (quoting Federal Circuit precedent describing Hyatt's patent applications and prosecution history as "extraordinary"); *id.* at *9 ("the applications could not be treated as typical applications given their size and scope."); *id.* at *28 ("Mr. Hyatt's applications are far from typical."); *id.* at *30 (same).

Implied in this dichotomy is that the PTO wishes the Court to find Mr. Hyatt caused unreasonable and unexplained delay in the examination against the benchmark of the PTO's typical practice. But the PTO itself explains a great deal of the delay: Mr. Hyatt's applications were not typical. *See also* 214-1 at *25. The court notes that anything "unusual" can cause delay by its very nature and not due to unreasonable actions of the applicant. Even "unique" and "extraordinary," *see* 214-1 at *32, do not necessarily connote "unreasonable." PTO's blind spot is in neglecting that the unusual scenario with which it was presented in Mr. Hyatt's GATT Bubble applications required it to employ and embrace atypical procedures for addressing the challenge before them. It appears to the Court that, from 1995 through today (and certainly 1995-2002),

---

[13] PTO repeatedly argues that, "To the extent certain rejections were reversed, this supports the USPTO's argument that the examiners could not effectively examine the cases under the time allowed, leading to reversal of the rejections that were made, and leading to further examination or appeals in the applications at issue." ECF no. 214-1 at *12, *13, *17. The PTO offered no evidence as to this alleged causal link, nor any comparative data concerning typical reversal rates at any level (agency-wide, within certain art groups, or among the specific examiners who took action on Hyatt's applications), from which the Court could reasonably draw such an inference. Strangely, the PTO also has not pointed the Court to any new ground for rejection that it has discovered since this litigation commenced and that wishes to assert in the four applications before the Court. This includes the lack of any double-patenting rejections, even though PTO's witnesses at trial discussed at length the importance of double-patenting reviews during examination. Even if it was impossible to conduct a complete double-patenting analysis in these four applications before their respective §145 actions were filed, PTO has had an additional 8-13 years to conduct those reviews, using ever-improving technologies to search the digitized file wrappers for Mr. Hyatt's applications. Just as resolution of a double-patenting rejection is not necessary for, and does not stand in the way of, advancing prosecution on all other matters, the filing of a §145 action does not prevent PTO from asserting double-patenting as a grounds for rejection before the district court. *See also Troy v. Samson*, 758 F.3d 1322 (Fed. Cir. 2014).

PTO seems, in the respects relevant here, largely to be wedded to its typical practices and procedures with only minor, if any adaptations.[14] The PTO's witnesses' numerous references during trial to a general policy and preference for examiners to engage in compact prosecution is unavailing. The PTO itself acknowledges that, despite its operational efficiency in the majority of cases, there is no legal requirement that the PTO engage in compact prosecution. *See* 214-1 at *8 (in light of *Troy v. Samson*'s application of *Kappos v. Hyatt*, "neither Mr. Hyatt, nor the USPTO, [is] required to make all arguments for or against patentability during examination.").

That the PTO simultaneously argues that "the applications could not be treated as typical applications given their size and scope," 214-1 at *9 (relating to proposed findings 52-53), and that the Court must consider the prosecution history in these cases in light of its typical procedures and timelines, is somewhat bizarre and, perhaps, unreasonable. Suffice it to say, PTO's lengthy, even noble attempts through 2002 to fit the large proverbial square peg of Hyatt's applications into the rounded-out and well-trodden hole of its 3,000 page practice manual do not warrant a prosecution laches finding against Mr. Hyatt.

The October '95 Meeting and Agreement

The PTO places much emphasis on Mr. Hyatt's October 1995 meeting with Mr. Nicholas Godici, a former PTO group Director, and the promises Mr. Hyatt made during that meeting to "focus" his claims. Although the PTO has certain formal mechanisms by which it can compel patent applicants to comply with its demands, there is no evidence this informal conference was

---

[14] The suspensions between 2003 and 2012 appear largely to be responses to pending litigation, not the applications, themselves. *Compare* ECF no. 200 at **45-51 *with* ECF no. 214-1 at **29-33. To the extent PTO resents having had to devise "unusual procedures . . .that were not needed with respect to other applicants, who for example, did not litigate regarding procedural issue[s] and did not file Section 145 appeals," ECF 214-1 at *32, the Court finds that sentiment to be somewhere between vexing and outright galling. It takes a certain chutzpah for a government agency to chafe against citizens seeking to vindicate their rights through lawfully available means, even in those cases where the opposing party's litigious zeal is itself remarkable for any number of reasons.

an exercise of any of those authorities. To the contrary, what little evidence there is concerning what was discussed at that meeting (since it was not contemporaneously memorialized) could be interpreted as it having been PTO's attempt to orient itself to the unusual challenge Mr. Hyatt's applications presented.

Patent applicants have discretion as to how to prosecute their claims within the PTO's rules and regulations. The PTO argues vehemently that Mr. Hyatt "frustrated examination by failing to cooperate with the USPTO" during the examination process. 214-1 at *18. *See also id.* at *7, *34, *36. It contends that "failing to cooperate [by failing to provide] material information that would assist examination" is inequitable conduct. *Id.* at *36. The Court is concerned by the PTO's characterization of a supposed "increased burden[] on the USPTO to examine Mr. Hyatt's claims resulting from Mr. Hyatt's lack of assistance." *Id.* at *18. Certainly it would seem to have been in Mr. Hyatt's interest to assist examination when invited to do so, if he had indeed prioritized having his applied-for patents issue at the earliest possible date. But this Court finds dubious the proposition that a Government agency can compel such self-help via an informal meeting, such that negative legal consequences result for the citizen who elects instead to pursue his own private enterprise while the bureaucracy fulfills its duties to the applicant and to the public. The potential economic benefit to Mr. Hyatt from PTO's difficulties under pre-GATT rules does not alter this principle, where PTO had ample opportunity over many years to act to resolve its difficulties through formal means. If the examiners(s), for example, could not find written description support for certain claims, *see id.*, the examiner was likewise empowered to issue written description rejections or other specific and formal Requirements under PTO rules and regulations, rather than await Mr. Hyatt's help, which, it appears obvious, was not forthcoming.

31

The PTO asserts: "That the USPTO could have, but did not" invoke certain authorities or make certain rejections earlier is irrelevant. 214-1 at *13 (as to undue multiplicity rejections and Rule 11.18); *id.* at *14 (as to Rule 1.145); *id.* at *27 (as to prosecution laches). The Court finds PTO's repetition of this concept rather troubling, as well. Though perhaps not relevant in a case in law, failure to exercise certain authorities is most certainly relevant in a *post hoc* equity determination where there was neither formal and proper notice nor opportunity for the applicant to cure the allegedly offensive conduct.[15] *Cf., e.g.,* 37 C.F.R. §11.18(c) (providing for adjudication of certain alleged rules violations "after notice and reasonable opportunity to respond."). Because "the PTO's authority to sanction undue delay is even broader than the authority of a district court to hold a patent unenforceable," *Bogese,* 303 F.3d at 1367, the PTO's decision not to exercise that authority is relevant to a district court's *ex post* analysis of the applicant's allegedly unreasonable delay in prosecuting his applications.

"The PTO has inherent authority to govern procedure before the PTO, and that authority allows it to set reasonable deadlines and requirements for the prosecution of applications." *In re Bogese,* 303 F.3d at 1368. Such deadlines were never set in a properly formal and binding manner here. Nor did the PTO take action to enforce compliance with the informal agreements it now argues it had with Mr. Hyatt, during the pendency of these applications before the agency. PTO examiners knew how to enter formal Restriction requirements, and even did so in his '639 application currently being litigated before this Court. This is critical because patent applicants are entitled to amend or cancel claims to traverse a ground of rejection. But in many of his

---

[15] The Court also questions the relevance of the PTO's curious speculation that, had it exercised certain authorities, "it would have only led to a procedural dispute with Mr. Hyatt, as it has today." 214-1 at *13 (regarding undue multiplicity rejections); *id.* at *14 (regarding Rule 11.18). If such a procedural dispute was inevitable, the PTO's own arguments in equity suggest that it would have been preferable to resolve those disputes at the earliest juncture.

applications, Mr. Hyatt was not given a similar opportunity to amend or cancel claims to avoid rejections during the period relevant here, *i.e.*, prior to 2003.

It is entirely likely that Mr. Hyatt "could have" been more helpful during the examination process. *Cf.* 214-1 at *19. But there is no abstract requirement for a citizen to tailor his conduct in pursuit of his constitutional right to a patent, to conform to what is "feasible" for the agency. *Cf., e.g.*, 214-1 at *23. Agency demands for further action by the filer of an accepted patent application must be tied to properly constituted statutory or regulatory authorities.[16] The Court is left with no choice but to conclude that the PTO itself ignored for 20 years the details of whatever informal agreement Mr. Hyatt and Mr. Godici had. PTO offers that "conversations between applicants and examiners, never mind Group Directors like Mr. Godici, are not always memorialized in interview summaries, even in typical cases, and Mr. Hyatt's applications are far from typical." 214-1 at *28. The atypicality of Mr. Hyatt's applications and his meeting with a Group Director would seem to be all the more reason to memorialize the conversation and agreement. Regardless, Mr. Hyatt and Mr. Godici did not reach any agreement that the Court can now enforce.[17] Further, Mr. Hyatt's failure to devise a "master plan" to "focus his claims" subsequent to the October 1995 meeting, *see* ECF No. 81-2 at *23; Trial Tr. 73:7-76:5 (Oct. 11, 2017 A.M. Session), though it may have been helpful for him to do so, did not violate his duty of disclosure, candor, and good faith to the PTO, as "There is no duty to submit information which is not material to the patentability of any existing claim." 37 C.F.R. §1.56(a).[18]

---

[16] Although the Court did not consider this fact when ruling on the plaintiff's Rule 52(c) motion, it is telling for context that Mr. Hyatt's trial testimony in the 09-1864 case that he was *told* to re-file photocopies of applications as placeholders *by* PTO personnel, went unchallenged and unrebutted. Trial Tr. 41:8-23, 09-cv-1864 (Feb. 12, 2018 A.M. Session).

[17] The Court understands that the PTO "does not seek to enforce a contract *per se*," 214-1 at *28, but reiterates that exercising its equitable powers against Mr. Hyatt in this context would be inappropriate.

[18] Notably, PTO did not invoke §1.56, including its "bad faith or intentional misconduct" language, as a ground to reject any of Mr. Hyatt's applications prior to this litigation. Further, 37 C.F.R. §11.18 itself specifies that alleged

The PTO fears that, in declining to agree with its position on prosecution laches here, the Court will have established that the PTO can suffer legally from attempting to resolve patentability issues at the examiner level without formally flexing its regulatory muscle. Although the Court does not wish today's ruling to chill informal interactions between examiners and applicants, the overall theme of PTO's case is to ask the Court to do as they now say, not as they have done, or failed to do, for decades. This is not a case where "designed delay" has been proven, *Woodbridge*, 263 U.S. at 56,[19] demanding the Court find "abandonment by conduct," *id*. at 59. Rather, the evidence before the Court principally Mr. Hyatt's decision not to affirmatively assist the PTO in its examination, despite the potential consequences for not doing so including, *e.g.*, having his applications rejected on any number of potential grounds for rejection in the 3,000 page Manual of Patent Examination Procedure. *See also* Trial Tr. 9:6-7 (October 6, 2017, P.M. Session) ("[C]ertainly the examiner needs to keep in mind all of those potential grounds of rejection."). One such ground of rejection is for lack of written description support under 35 U.S.C. §112, by far the most common rejection at issue on the remaining claims in the four applications before the Court. The Court is highly skeptical of PTO's contention that failing to provide written description support for a claim or element of a claimed invention, a statutory ground for rejection on the merits, is simultaneously evidence of "unreasonable delay." *See* Trial Tr. 25:1-7 (Oct. 13, 2017, P.M. Session). To equate the two would certainly would run counter to the Supreme Court's ruling in *Kappos v. Hyatt* allowing patent applicants to present new evidence in §145 cases, and effectively divest the Court of jurisdiction to review §112 rejections on the merits in a §145 proceeding.

violations of the PTO's certification requirements are to be adjudicated by the PTO "after notice and reasonable opportunity to respond." *Id.* at §11.18(c).

[19] Indeed, the PTO hast repeatedly disclaimed any attempt at all to show Mr. Hyatt intended to obstruct the patent system.

34

The Court here does not wish to incentivize the PTO to take an unreasonably hard line against flawed but meritorious applications – examiners working in concert with applicants to ensure patents are awarded when deserved lies at the heart of PTO's mission. But the PTO cannot have it both ways here – it cannot at once lament decades of allegedly outrageous conduct, while simultaneously arguing that its own inaction for much of that time is irrelevant to the Court's analysis. If Mr. Hyatt's conduct were so outrageous as to make available so many potential grounds for the PTO to take definitive action against his claims or entire applications, there comes a time that a court must ask, "Why not?" The answer in a case like this cannot simply amount to the bureaucratic equivalent of, "We were just being nice."

Further, aside from generalizations about Mr. Hyatt's conduct, PTO presented no evidence of just how much of the delay was caused by Mr. Hyatt's representations concerning the focusing of his claims. That the PTO finally, in 2015, got fed-up enough with the difficulties of examining Mr. Hyatt's claims that it began issuing prosecution laches rejections, does not itself have any relevance to this Court's treatment of the applications' respective prosecution histories through 2002.

Other Matters

Mr. Hyatt paid to PTO over $7 million in fees for the 400 applications at issue; PTO has spent more than $10 million in the last five years examining his claims in those applications. "This means that the amount of money Mr. Hyatt was paid does not approach the amount of time spent to examine his claims." 214-1 at *13. The PTO's fiscal "loss" in the course of examining Mr. Hyatt's applications is given little weight. The PTO both sets the examination fees and, through various mechanisms, the salaries of the employees assigned to examine Mr. Hyatt's applications. Presumably it does so in a manner designed to be fiscally neutral over time – the PTO will

35

inevitably see either some "profit" or "loss" as to nearly any application or applicant, but those gains and losses should even out over time in accord with the Law of Large Numbers, despite the occasional outlier to typical examination scenarios.

Mr. Hyatt argues that the PTO's allegations of claim shifting is "just applying a new label to its contentions regarding the number of claims in Mr. Hyatt's applications and Mr. Hyatt's amendment practice." ECF No. 200 at *23. The Court disagrees. There is a fundamental difference between amending a patent application by adding new numbered claims (and paying the accompanying fees), and significantly amending the language of individual claims that have neither been cancelled nor re-numbered in such a way as to effectively create a new claim. At the very least, the latter red-line method is more opaque and complicates review of an administrative record far more than the former. Indeed, the Court in other circumstances would likely be inclined to agree with the PTO that shifting "is inimical to furthering prosecution." DX-136.000026. But the Court here is faced with the facts that: 1) it is "not unusual to see a few claims rewritten," Trial Tr. 88:7-8 (Oct. 10, 2017, P.M. Session); 2) most if not all of the activity in question occurred, as PTO ensured the Court was aware, after the October 1995 meeting between Mr. Hyatt and Mr. Godici; Trial Tr. 75:16-17, 79:15-17, 81:22-24, 85:22-86:4, 91:6-11 (Oct. 10, 2017 P.M. Session); and 3) the PTO accepted the amendments and continued examination of each of these applications to their conclusion. Under the circumstances, the PTO has not made clear to the Court by a preponderance of the evidence that the agency found any of the amendments to be unreasonable at the time they were filed or for several years afterward. The PTO did not reject the amendments, nor does it appear that any PTO official attempted to schedule a second meeting with Mr. Hyatt to clarify the matters discussed in 1995 or express that the amendments were not in accord with the agreement, which one might reasonably have suspected to occur if the PTO assessed that Mr. Hyatt

36

was doing anything other than attempting to refocus his claims per the informal agreement made during the 1995 meeting. The Court sees and appreciates the challenge that faced the PTO in processing these unusual applications during an unique time of a paradigm shift in the U.S. patent system, but the PTO has left the Court without a basis to draw such adverse conclusions against Mr. Hyatt's conduct at this stage, in this legal posture, when the PTO itself did nothing to police the conduct they now complain of for the better part of two decades. In any event, much of the PTO's testimony on this matter was conclusory, and it did not present evidence of just how Mr. Hyatt's alleged claim shifting unduly frustrated examination in the four applications before the Court, and PTO has not presented evidence sufficient to establish that other applications saw similar shifts before 2003 and that the shifts in those applications and the four before the court mutually, unreasonably, and inexplicably delayed examination to such an extent as to warrant dismissal for prosecution laches for conduct up through that time. Had the PTO done so, this might be a significantly different case.

The PTO introduced evidence concerning four claims not in the applications before the Court that Mr. Hyatt re-submitted despite having previously lost them in interference. *Hyatt v. Boone*, 146 F.3d 1348 (Fed. Cir. 1998). It is reasonable for the PTO to assume that an applicant is not claiming an invention that he has already been told he did not invent. And it is unreasonable for Mr. Hyatt to continue to seek claims that he has lost, particularly without noting the similarity of the claims to the examiner, thereby forcing the PTO to expend time and resources to identify the improper conduct to issue the rejection(s). *See, e.g.*, Trial Tr. Day 3 P.M. Session, 5:6-15:2, Oct. 11, 2017; Trial Tr. Day 4 P.M. Session, 43:4-49:16, Oct. 12, 2017; DX1486 ¶¶ 29, 220-225. Mr. Hyatt's conduct as to these four claims was not reasonable. But unreasonable conduct as to

37

four allegedly illustrative claims does very little to move the ball in consideration of the totality of Mr. Hyatt's conduct across approximately 115,000 claims.

## IV. CONCLUSION

In light of the above, the Court concludes that Mr. Hyatt's conduct did not cause unreasonable and unexplained delay under the totality of the circumstances relevant here sufficient to warrant dismissal of these four matters for prosecution laches. In so holding, the Court takes this opportunity briefly to clarify the scope of this opinion.

The PTO objected to Mr. Hyatt's proposed findings and conclusions, among other reasons, "to the extent they find or conclude that Mr. Hyatt's conduct in the related 400 applications still pending before the USPTO did not result in or cause any unreasonable and unexplained delay with respect to those applications." 214-1 at *4. Although the Court's opinion today does not reach those applications not subject to the §145 cases before it, it is worth noting that the PTO's objection in this regard rests on similarly faulty logic to the rest of its laches argument. First, the PTO insists the Court consider the totality of the circumstances, including Mr. Hyatt's conduct in prosecuting those other 400 applications. The PTO, again, cannot have it both ways – the Court is dubious of the notion that any consideration of Mr. Hyatt's conduct with respect to the other applications can nevertheless produce a judgment that has no bearing whatsoever on those same applications. To the extent the PTO wishes the Court to mine and weigh the evidence produced relative to Mr. Hyatt's applications that are not themselves before the Court, the Court is fully capable and authorized to make findings and conclusions as to the entirety of the evidence the PTO has produced for the Court to consider. The PTO's strategy in pursuit of its prosecution laches theory thus was a gamble with potentially widespread ramifications. It was not Mr. Hyatt's §145 merits actions, but the PTO itself that created the possibility of such an outcome.

Although the PTO did not prevail in its gamble here, the Court's ruling today is nevertheless a narrow one. The Court today grounds its ruling in findings as to the prosecution conduct before the PTO up through 2002, the last date the PTO includes in its own calculations prior to the onset of litigation in these cases. The Court's opinion does not reach patent prosecution conduct after those dates, and should not be read either to draw conclusions based upon later conduct, nor upon the PTO's prosecution laches rejections that presumably took into account that later conduct in conjunction with pre-2003 conduct in a totality of the circumstances approach.[20]

In other words, though Mr. Hyatt's 1995-2003 conduct itself is not sufficient to warrant applying prosecution laches here; that does not mean that it is irrelevant to a totality of circumstances analysis that would include later-occurring events.

An order consistent with this holding accompanies this opinion.

Date: 7/31/18

Royce C. Lamberth
United States District Judge

---

[20] The Court likewise makes no findings or conclusions as to the intervening rights of third-parties.