# United States Court of Appeals for the Federal Circuit

---

**GILBERT P. HYATT,**
*Plaintiff-Cross-Appellant*

**v.**

**ANDREW HIRSHFELD, PERFORMING THE FUNCTIONS AND DUTIES OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Defendant-Appellant*

---

2018-2390, 2018-2391, 2018-2392, 2019-1038, 2019-1039, 2019-1049, 2019-1070

---

Appeals from the United States District Court for the District of Columbia in Nos. 1:05-cv-02310-RCL, 1:09-cv-01864-RCL, 1:09-cv-01869-RCL, 1:09-cv-01872-RCL, Senior Judge Royce C. Lamberth.

---

Decided: June 1, 2021

---

ANDREW M. GROSSMAN, Baker & Hostetler LLP, Washington, DC, argued for plaintiff-cross-appellant. Also represented by MARK W. DELAQUIL, JASON F. HOFFMAN.

THOMAS W. KRAUSE, Office of the Solicitor, United

States Patent and Trademark Office, Alexandria, VA, argued for defendant-appellant. Also represented by ROBERT MCBRIDE, ROBERT J. MCMANUS, MOLLY R. SILFEN.

_____

Before REYNA, WALLACH, and HUGHES, *Circuit Judges.*

REYNA, *Circuit Judge.*

The United States Patent and Trademark Office appeals a judgment of the United States District Court for the District of Columbia. Patent applicant Gilbert P. Hyatt filed an action under 35 U.S.C. § 145 against the Patent and Trademark Office to obtain four patents. The Patent and Trademark Office asserted affirmative defenses of prosecution laches and invalidity for anticipation and lack of written description. The district court first held a trial on prosecution laches and subsequently held trials on anticipation and written description. Following a Rule 52(c) motion at the first trial, the district court decided that the Patent and Trademark Office failed to carry its burden of proving prosecution laches. Following the patentability trials, the district court decided that certain claims were not invalid for anticipation or lack of written description and ordered the Patent and Trademark Office to issue patents as to those claims.

We hold that prosecution laches is a defense available to the Patent and Trademark Office in an action to obtain a patent under 35 U.S.C. §145. We further hold that the district court erred in concluding that the Patent and Trademark Office had failed to prove prosecution laches. Accordingly, consistent with the principles of fairness and due process, we vacate and remand the district court's decision on prosecution laches for further proceedings consistent with this opinion and to provide Hyatt the opportunity to present evidence on that issue. We hold the remainder of the case in abeyance, retaining jurisdiction over the anticipation and written description issues.

## BACKGROUND

### Submarine Patents

Prior to 1995, a patent's term was measured as 17 years from the date of issuance. *See, e.g.*, *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1211 (Fed. Cir. 2014). The fact that patent term was keyed to the date of issuance, rather than the date of filing, incentivized certain patentees to delay prosecuting their patents by abandoning applications and filing continuing applications in their place. By doing so, patentees could obtain a patent at a financially desirable time when the accused product market had become suitably developed. *See, e.g.*, Thomas J. Kowalski & Pamela G. Salkeld, *The Impact of GATT on the United States Patent and Trademark Office*, 11 ST. JOHN'S J. LEGAL COMMENT. 455, 456 (1996) [hereinafter Kowalski] ("Under the old law, United States patent applications could theoretically remain pending indefinitely through use of the 'continuation' procedure of refiling."). This delay strategy has allowed some submarine patentees to specifically target competitors' new products. Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. REV. 63, 76–78 (2004) [hereinafter Lemley]; *see also* Steve Blount & Louis S. Zarfas, *The Use of Delaying Tactics to Obtain Submarine Patents and Amend Around a Patent That a Competitor Has Designed Around*, 81 J. PAT. & TRADEMARK OFF. SOC'Y 11, 13, 28–30 (1999); John W. Schlicher, 2 Patent Law, Legal and Economic Principles § 13:11 (2d ed. 2015) [hereinafter Schlicher]. Critics of this practice have argued that it harms industries by upsetting the expectations of product manufacturers who have invested in manufacturing facilities. *See, e.g.*, Lemley, 84 B.U. L. REV. at 80; *see also* Schlicher, 2 Patent Law, Legal and Economic Principles § 13:11. The ability to avoid publication of an application offers further opportunity for abuse because it deprives the public of timely disclosure, which is a central goal of the patent system. Lemley, 84 B.U. L. REV. at 73.

Submarine patents have also added to the administrative burdens on the U.S. Patent and Trademark Office ("PTO"). Long chains of applications increase patent examiners' caseloads, which have long tended to be large. *See, e.g.*, Eugene R. Quinn, Jr., *The Proliferation of Electronic Commerce Patents: Don't Blame the PTO*, 28 RUTGERS COMPUTER & TECH. L.J. 121, 123 (2002) (stating that "patent examiners are simply too overworked" to weed out "patents that ought not see the light of day"); John R. Thomas, *The Question Concerning Patent Law and Pioneer Inventions*, 10 HIGH TECH. L.J. 35, 100 (1995) (stating that examiners are "notoriously overworked"). Aware of this reality, some submarine patentees have employed the strategy of "wearing down" patent examiners over time and thereby obtaining a broader patent scope than warranted. *See, e.g.*, Lemley, 84 B.U. L. REV. at 74–75.

During negotiations of the Agreement on Trade-Related Aspects of Intellectual Property ("TRIPS Agreement") at the Uruguay Round of the General Agreement on Tariff and Trade ("GATT"), the U.S. sought to address the problem of submarine patents by agreeing to change the term of U.S. patents from 17 years following the date of issuance to 20 years following the filing date of the application or an earlier non-provisional application to which the subject application claims priority. TRIPS Agreement art. 33, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299, 33 I.L.M. 1197, https://www.wto.org/english/docs_e/legal_e/27-trips.pdf. Congress then enacted this change in patent term into law. Uruguay Round Agreements Act, Pub. L. No. 103-465, § 532, 108 Stat. 4809, 4984 (1994) (amending 35 U.S.C. § 154 to provide a patent term of 20 years*); see also Supernus Pharms., Inc. v. Iancu*, 913 F.3d 1351, 1353 (Fed. Cir. 2019).

The U.S.'s change in patent term, which would become effective on June 8, 1995, triggered a patent application gold rush in the spring of 1995 often referred to as the

"GATT Bubble." *See Hyatt v. Iancu*, 332 F. Supp. 3d 113, 122 (D.D.C. 2018) ("*Iancu*"); Kowalksi, 11 ST. JOHN'S J. LEGAL COMMENT. at 456–57. Applicants filed a large number of applications in the short period before the change in patent term. For example, in the nine days leading to June 8, 1995, the PTO reported that it received and processed over 50,000 applications—one-quarter of the entire year's projected filings. *PTO Applications*, 50 PAT., TRADEMARK & COPYRIGHT J. 253 (July 13, 1995). The influx from the GATT Bubble was so large that the PTO hired hundreds of patent examiners in 1995 and 1996 to process it. *See* Kowalski, 11 ST. JOHN'S J. LEGAL COMMENT. at 457.

## Hyatt's Applications

As relevant to this appeal, Gilbert P. Hyatt is the named inventor on 399 patent applications, 381 of which he filed during the GATT Bubble. *See Iancu*, 332 F. Supp. 3d at 118; J.A. 31859. Hyatt bulk-filed the 381 applications, each one being a photocopy of one of 11 earlier parent applications. *See, e.g.*, J.A. 29444, 31859, 29407, 18944; *Iancu*, 332 F. Supp. 3d at 118. When filed, the applications contained small claim sets, many of which were identical to each other. *See, e.g.*, J.A. 29444, 29406–07.

This appeal specifically involves four of Hyatt's GATT Bubble applications: U.S. Patent Application No. 08/457,211 ("'211 application"), U.S. Patent Application No. 08/456,398 ("'398 application"), U.S. Patent Application No. 08/472,062 ("'062 application"), and U.S. Patent Application No. 08/431,639 ("'639 application"). These four applications relate to various computer technologies[1] and claim priority to applications filed in the 1970s and 1980s,

---

[1]    The specifics of the disclosed technologies do not materially affect this opinion.

which pre-date the applications by a range of 12 to 25 years.[2]

Hyatt's GATT Bubble applications, including the four at issue here, are atypically long and complex. According to PTO data, a typical patent application contains about 20 to 30 pages. *Iancu*, 332 F. Supp. 3d at 124. In contrast, the '211 and '398 applications have 576 pages of text and 65 pages of figures; the '062 patent includes 238 pages of text and 40 pages of figures; and the '639 application includes 518 pages of text and 46 pages of figures. *Id.*

On October 24, 1995, about five months after Hyatt filed his GATT Bubble applications, PTO group Director Nicholas Godici met with Hyatt to discuss the applications. Director Godici asked Hyatt, and Hyatt agreed, to focus each application's claims on distinct subject matter. *Id.* at 128. Neither party memorialized the agreement at the time, but neither party disputes that it occurred. *Id.*; J.A. 41516, 29348 ll. 3–14.

Between that meeting and 2003, Hyatt filed a series of amendments in his applications that grew the number of claims to a total of approximately 115,000, including approximately 45,000 independent claims. *See, e.g.*, J.A. 38154, 38161–62, 29555, 29444; *Iancu*, 332 F. Supp.

---

[2]    The '211 application was filed on June 1, 1995, and claims priority to an application filed 12 years earlier in 1983. J.A. 7606–07, 8705, 14397–98. The '398 application was filed on June 1, 1995, shares the same specification as the '211 application, and claims priority to the same 1983 application. J.A. 8705, 14397–98, 14560. The '062 application was filed on June 6, 1995, and claims priority to an application filed 20 years earlier in 1975. J.A. 16071–73, 16453. The '639 application was filed on May 1, 1995, and claims priority to an application filed 25 years earlier in 1970. J.A. 18097–101.

3d at 124. Hyatt's GATT Bubble applications therefore eventually contained, on average, 300 claims per application, which far exceeded the average number of claims in applications pending before the PTO. *See Iancu*, 332 F. Supp. 3d at 124. The four specific applications at issue here included a total of 1,592 claims, i.e., an average of 398 claims per application. *See id.*

Mr. Hyatt's claim amendments adding hundreds of claims per application on average meant that Hyatt had presented claims for examination between 12 and 28 years after their alleged priority dates. Specifically, Mr. Hyatt waited from 25 to 28 years to present his claims in the '639 application, J.A. 18614–56, 18033–41, 17976–8022, 17889–947, 17707–832; 12 to 16 years to present those in the '211 application, J.A 9281–89, 8018–40, 7983–8015, 7825–49, 7640–719, 7539–93, 7019–111; 12 to 20 years to present those in the '398 application, J.A. 15210–19, 14536–58, 14317–96, 14288–314, 14257–85, 14118–204, 13574–685, 13520–49, 47748; and 20 to 21 years to present those in the '062 application, J.A. 16690–95, 16367–97, 16330–37, 16243–314. For these many years, Mr. Hyatt's inventions were submerged.

From 2003 to 2012, the PTO stayed the examination of many of Hyatt's applications pending litigation. Hyatt's applications have been involved in various cases before the federal courts whose outcomes were likely to affect PTO's handling of most or all of his other applications.[3] *See*

---

[3]    Hyatt's lawsuits have addressed a variety of issues, such as challenging examiners' written description rejections, *Hyatt v. Dudas*, 492 F.3d 1365 (Fed. Cir. 2007); challenging the PTO's ability to use representative claims in Board decisions, *Hyatt v. Dudas*, 551 F.3d 1307 (Fed. Cir. 2008); and challenging the PTO's position that plaintiffs in § 145 actions may present new evidence only if it had no

J.A. 18944; *Hyatt v. USPTO*, No. 1:13-CV-1535, 2014 WL 2446176, at \*1 (E.D. Va. May 29, 2014).

### The PTO's Requirements

In 2013, the PTO resumed examination of Hyatt's applications. Around that time the PTO created an art unit, comprised originally of 12 experienced examiners, dedicated to examining Hyatt's applications. *See Iancu*, 332 F. Supp. 3d at 119; J.A. 29366, 29567–68. Initially the examiners took a compact prosecution approach, in which they prepared a fulsome set of rejections on the first office action so that the next action might become final. J.A. 29433, 29569. The examiners took approximately four to five months to write their first office actions, each of which spanned hundreds of pages. *See, e.g.*, J.A. 29567–69, 38187 n.7. In contrast, a typical examination took 20 hours, or two to three business days, of examiner time. J.A. 29570.

To facilitate the examination process, from August to October 2013, the PTO issued 11 notifications to Hyatt called "Requirements." *See, e.g.*, J.A. 31856–96, 32885–923, 33585–645, 33646–73, 36310–47, 36565–93, 36705–38, 37031–69, 37837–72, 38094–150, 38151–96. Each Requirement corresponded to a set of applications that shared a common specification belonging to one of the GATT Bubble applications' 11 parent applications. *See, e.g.*, J.A. 31860–62. These Requirements were designed to solicit information from Mr. Hyatt that would streamline prosecution of his applications.

The PTO first described the challenges that Hyatt's applications had created. For example, the PTO could not reasonably ascertain the priority dates of the claimed inventions because the applications claimed priority to numerous applications. *See, e.g.*, J.A. 31863–64 (listing the

reasonable opportunity to present it to the PTO in the first instance, *Kappos v. Hyatt*, 566 U.S. 431 (2012).

43 applications filed from 1969 to 1983 to which one group of applications claimed priority). The length of the applications, as well as the length of the priority applications, also hindered examiners' ability to determine compliance with 35 U.S.C. § 112. *See, e.g.*, J.A. 31865–66. The PTO further explained that the number of claims, and their multiplication through amendments since 1995, also posed a significant hurdle to processing the applications. *See, e.g.*, J.A. 31869–72. The PTO also pointed out a large amount of repetition and redundancy of claims across applications. J.A. 31872–85. Because of these factors, the PTO estimated it would take 532 years of examiner time at its then-current rate to process Hyatt's applications. J.A. 31886 & n.14. The PTO therefore instructed Hyatt to (i) select no more than 600 total claims to pursue for each of the 11 specifications; (ii) identify the priority date and support for that date with respect to each chosen claim; and (iii) submit a clean copy of the claims. *See, e.g.*, J.A. 31888–91.

### Examination and Review by the Board

The four Hyatt applications' claims were finally rejected and reviewed on appeal by the Board of Patent Appeals and Interferences ("Board"), which affirmed rejections of certain claims in each application. *Iancu*, 332 F. Supp. 3d at 124–26. Specifically, during examination of the '639 application, an examiner rejected all pending claims for lack of written description or obviousness. J.A. 626–27. The Board affirmed in part and reversed in part, placing some claims in condition for allowance. J.A. 715–16. On rehearing, the Board withdrew only certain additional rejections. J.A. 762.

During examination of the '211 application, an examiner rejected all but a small number of claims for lack of written description, lack of enablement, and obviousness, and the Board reversed certain non-enablement and obviousness rejections. J.A. 207, 213, 262–63. On rehearing,

the Board denied Hyatt's request to withdraw additional rejections. J.A. 280.

Further, an examiner rejected all claims in the '398 application for lack of written description and some of those claims for obviousness or anticipation. J.A. 285. The Board affirmed in part and found a new ground for rejection under § 101. J.A. 286, 383–84. On rehearing, the Board withdrew certain additional written description and prior art-based rejections. J.A. 554.

As for the '062 application, an examiner rejected all claims for lack of written description and enablement, as well as for obviousness-type double patenting. J.A. 557, 564. The Board affirmed certain § 112 rejections and the double patenting rejection for one claim and reversed rejections as to other claims. J.A. 601. On rehearing, the Board withdrew its written description rejection with respect to one claim. J.A. 624.

### Hyatt's § 145 Actions

On November 18, 2005, Hyatt filed a § 145 action[4] in the U.S. District Court for the District of Columbia seeking issuance of a patent from the '211 application. J.A. 60284–

---

[4] An applicant may appeal an adverse decision by the Board directly to this court or may file a civil action in district court under 35 U.S.C. § 145 to obtain a patent. 35 U.S.C. § 145; *Hyatt v. Kappos*, 625 F.3d 1320, 1322 (Fed. Cir. 2010), *overruled on other grounds by Kappos v. Hyatt*, 566 U.S. 431 (2012). We have explained that the § 145 action is a hybrid action. *Hyatt*, 625 F.3d at 1322. It is unlike an appeal because the plaintiff can present new evidence. *Id.* However, if the applicant presents no new evidence, then the district court reviews the action on the administrative record, *id.*, and the district court reviews de novo any issue for which the applicant presents new evidence, *id.* at 1336.

89. On September 25, 2009, he filed three additional § 145 actions in the same court with respect to the '398, '062, and '639 applications. J.A. 60291–304. In each complaint, Hyatt alleged that the PTO had made factual errors and failed to comply with the law in refusing to issue patents from these applications. *See* J.A. 60284–304.

On August 23, 2016, the district court issued a series of orders on the parties' motions for summary judgment. The court denied Hyatt's motions, and granted the PTO's motions in part. J.A. 195, 47210–11, 55447–70, 56065–82. The district court explained that factual issues precluded summary judgment on certain issues, including written description, anticipation, and obviousness-type double patenting. J.A. 55449–70, 56067–82.

The next month, the PTO filed a motion to dismiss each case on prosecution laches grounds. *Iancu*, 332 F. Supp. 3d at 117–18; J.A. 134–35, 155–56, 176–77, 196–97, 18891–941. The PTO argued that Hyatt had engaged in a "pattern of delay in prosecuting his nearly 400 patent applications from 1969 through the present day." J.A. 18902. According to the PTO, that was true even disregarding the period from 2003 to 2012—which the PTO did not rely on—when the PTO suspended prosecution of most of Hyatt's applications due to pending litigation. *Iancu*, 332 F. Supp. 3d at 124, 129, 133 n.14. The PTO argued that Hyatt forfeited his patent rights by, for example, claiming priority to applications more than 45 years old; bulk-filing about 400 photocopies of 11 applications in the days before the U.S.'s patent term changed on June 8, 1995; and agreeing to focus each application on a different invention but not doing so and later revealing that he never had a "master plan" for demarcating the applications. *Id.* at 117–18.

Hyatt responded that his prosecution of applications other than the four at issue was legally irrelevant; that the PTO itself engaged in extensive delays in administering his applications; that the PTO did not warn him, as allegedly

required, that he was in jeopardy of losing his patent rights; and that the PTO failed to prove intervening rights as necessary to establish prosecution laches. J.A. 19289. Hyatt also argued that his delays were explainable because, for example, PTO rules permitted Hyatt to add and amend claims, and Hyatt did so to correctly capture his inventions and steer clear of prior art. *See, e.g.*, Pl.'s Opp. to Def.'s Mot. to Dismiss for Prosecution Laches at 10, Hyatt v. Matal, No. 1:05-cv-02310-RCL (D.D.C. Jan. 9, 2017), ECF No. 101.[5] The court treated the PTO's motions to dismiss as motions for summary judgment and denied them because genuine issues of material fact existed. *Iancu*, 332 F. Supp. 3d at 118.

In October 2017, the district court held a five-day, consolidated bench trial on whether prosecution laches barred the issuance of patents from the '211, '398, '062, and '639 applications. *Id.* The PTO presented three witnesses: (i) Robert Clarke; (ii) Gregory Morse; and (iii) Stephen Kunin. *Id.* at 118–19.

Mr. Clarke testified on behalf of the PTO about its patent examination procedures. Mr. Clarke served as the editor of the Manual of Patent Examining Procedure ("MPEP") and had previously held other high-level positions at the PTO, including Chief of Staff and Director of the Office of Patent and Legal Administration. J.A. 29185. He testified, for example, that Director Godici met with Hyatt on October 24, 1995, and asked Hyatt to demarcate his applications. *See* J.A. 29348, 41516. Mr. Clarke further testified that the PTO's practice is to bring prosecution to a close as quickly as possible. J.A. 29320. He also testified

---

[5]    Hyatt filed apparently identical oppositions in the other three cases, No. 1:09-cv-01864-RCL (regarding the '398 application); No. 1:09-cv-01872-RCL (regarding the '639 application); and No. 1:09-cv-01869-RCL (regarding the '062 application).

that "it's possible" that the PTO could have devoted more resources to Hyatt's applications. J.A. 29320–21.

Mr. Morse served as the supervisor of Group Art Unit 2615, the unit dedicated to Hyatt's applications. J.A. 29363–64; *Iancu*, 332 F. Supp. 3d. at 119. Mr. Morse's testimony focused on the history and nature of Hyatt's applications, the unique challenges they posed to the PTO, and the PTO's handling of the applications. *See, e.g.*, J.A. 29363–67, 29399–486, 29543–620, 29639–50, 29657, 29807, 29823. According to Mr. Morse, the complexity, number, size, and overlap of Hyatt's applications and claims made it difficult, if not impossible, for examiners to determine the claims' priority dates for purposes of identifying the relevant body of prior art, to determine whether the claims satisfy the written description requirement, and to identify double patenting issues. *See, e.g.*, J.A. 29368, 29417–26, 18944. Further complicating the examiners' task was their need to find not only disclosures of individual claim elements, but more specifically disclosures of interconnections between those elements. J.A. 29435–36. Hyatt's tendency to rewrite claims in whole or in significant part midway through prosecution effectively restarted prosecution for the newly rewritten claims. J.A. 29464–66, 19471–72. When asked whether Hyatt had been forthcoming about priority dates before the PTO issued its Requirements in the fall of 2013, Mr. Morse responded, "No. That has been a persistent issue across this entire family of applications." J.A. 29429.

Mr. Kunin testified as an expert witness regarding the PTO's patent policy, practice, and procedure. Mr. Kunin opined, in summary, that "Mr. Hyatt's pattern of conduct unreasonably and unexplainably delayed prosecution, resulting in needlessly increased examiner time and its associated costs to the USPTO to conclude examination of his applications." J.A. 39235–83; *see also* J.A. 30200, 29990. Mr. Kunin pointed to several factors in support. For example, Hyatt had delayed years and sometimes multiple

decades after his alleged priority dates to submit claims. J.A. 30201. According to Mr. Kunin, unreasonable and un-explainable delay also resulted from Hyatt's pattern of con-duct during prosecution, including (i) dramatically increasing, i.e., unduly multiplying, the number of claims[6] contrary to 37 C.F.R. 1.75(b); (ii) rewriting, i.e., shifting, claims in large portions or in their entirety contrary to 37 C.F.R. § 1.145; (iii) presenting numerous duplicate or patentably indistinct claims across applications without in-forming the PTO contrary to MPEP §§ 2001.06(b), 2004(9); and (iv) failing to identify written description support for claims contrary to MPEP §§ 714.02, 2163.06. *See, e.g.*, J.A. 30201; *see also* J.A. 39238. Mr. Kunin pointed to additional specific instances of prosecution conduct that evinced the unreasonableness of Hyatt's prosecution conduct, namely (i) filing claims that Hyatt had already lost in interference proceedings without informing the examiner; (ii) failing to take allowed claims but rather refiling them years after their allowance in a separate application; and (iii) failing to prosecute district court actions under § 145. *See, e.g.*, J.A. 30202.

At the close of the PTO's case-in-chief on prosecution laches, Hyatt moved for judgment on partial findings pur-suant to Rule 52(c) of the Federal Rules of Civil Procedure.[7] *Iancu*, 332 F. Supp. 3d at 119. Hyatt argued that the PTO

---

[6]    Mr. Kunin also testified that fewer than 0.02% of all applications filed from 1995 to 2013 included 299 or more claims. J.A. 39243.

[7]    Rule 52(c) provides that, in a nonjury trial, if a party has been fully heard on an issue and the court finds against the party on that issue, "the court may enter judg-ment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." FED. R. CIV. P. 52(c).

failed to prove prosecution laches because the PTO (i) did not show it provided Hyatt with adequate warnings of laches rejections; (ii) did not prove intervening rights; (iii) never issued laches rejections for the four applications at issue; and (iv) failed to meet its burden of proving unreasonable and unexplained delay by a preponderance of the evidence. *Id.*

In the months following the prosecution laches trial, the district court conducted additional bench trials on the patentability of the four applications' claims. *See* J.A. 140–43, 160–63, 182–83, 202–04.

### The District Court's Decisions

On August 1, 2018, the district court issued a series of orders resolving the issues in the four cases. First, it dismissed the case with respect to the '062 application because the parties no longer disputed claim 45, the only claim that remained after the court's summary judgment orders. J.A. 120.

The court issued a separate order pursuant to Rule 52(c) of the Federal Rules of Civil Procedure concluding that prosecution laches did not bar issuance of patents from the '211, '398, '062, and '639 applications. *See Iancu*, 332 F. Supp. 3d at 131, 138. The central thrust of the district court's analysis was that the PTO had failed to take the actions necessary to advance the prosecution of Hyatt's applications. *See id.* at 131–38. At the outset, the court explained that it would only consider delay up to 2002 in its analysis because (i) the PTO "shoulders responsibility" for suspending prosecution of Hyatt's applications pending litigation from 2003 to 2012, and (ii) after 2012, the relevance of Hyatt's delays in prosecuting applications other than the four at issue "is so circumspect that the [c]ourt must decline to consider it here." *Id.* at 131–32.

The district court reasoned that the uniqueness of Hyatt's voluminous applications "required [the PTO] to

employ and embrace atypical procedures for addressing" his applications. *See id.* at 133. The court faulted the PTO for trying to "fit the large proverbial square peg of Hyatt's applications into the rounded-out and well-trodden hole of its 3,000 page practice manual." *Id.* According to the court, the PTO's refusal to adopt "atypical procedures" made a finding of prosecution laches "[un]warrant[ed]." *Id.*

The district court then found the PTO's efforts to advance prosecution—including the October 1995 meeting between Hyatt and Director Godici—were so informal and inadequate as to preclude a finding of prosecution laches. *Id.* at 134–37. The court faulted the PTO for not using "specific and formal" measures up to 2002 to obtain the information it needed from Hyatt to successfully administer his applications. *Id.* at 134. According to the court, the PTO should have used formal measures "rather than await Mr. Hyatt's help, which, it appears obvious, was not forthcoming." *Id.* The court stated that "it would seem to have been in Mr. Hyatt's interest to assist examination when invited to do so, if he had indeed prioritized having his applied-for patents issue at the earliest possible date." *Id.* The court further found that the PTO's non-use of more formal measures to seek information and amendments deprived Hyatt of an "opportunity to amend or cancel claims to avoid rejections." *Id.* at 134–35. If the PTO had used such measures, the court reasoned, "[i]t is entirely likely that Mr. Hyatt could have been more helpful during the examination process." *Id.* at 135 (quotation omitted). The court explained that it was "left with no choice but to conclude that the PTO itself ignored for 20 years the details of whatever informal agreement Mr. Hyatt and Mr. Godici had." *Id.* The PTO "cannot have it both ways here," the court explained, by "lament[ing] decades of allegedly outrageous conduct" while arguing its own inaction is irrelevant. *Id.* at 136.

The district court made various additional determinations in a section at the end of its order titled "Other

Matters." *Id.* at 137. First, the district court assigned little weight to the fact that the PTO spent more than $10 million in the last five years examining claims in Hyatt's GATT Bubble applications whereas Mr. Hyatt had only paid about $7 million in fees. *Id.*

Second, the court concluded that Mr. Hyatt's "claim shifting"—or amending claims so significantly "as to effectively create a new claim"—did not warrant a finding of prosecution laches. *Id.* at 137–38. The district court again faulted the PTO for "accept[ing] the amendments and continu[ing] examination" in such cases. *Id.* at 137. The court "appreciate[d] the challenge that faced the PTO in processing these unusual applications," but nevertheless stated it could not bar the patents for prosecution laches because "the PTO itself did nothing to police the conduct they now complain of for the better part of two decades." *Id.*

The court next found insufficient the PTO's evidence that Hyatt had re-introduced claims in the applications at issue even though he had previously lost them in interference proceedings. *Id.* at 138. The court found Hyatt's conduct "was not reasonable," and that the PTO is entitled to assume that an application is not claiming an invention he already lost. *Id.* But nevertheless, the court reasoned, Hyatt's "unreasonable conduct as to four allegedly illustrative claims does very little to move the ball in consideration of the totality of Mr. Hyatt's conduct across approximately 115,000 claims." *Id.*

That same day, August 1, 2018, the district court issued another order addressing the patentability of the four applications' claims at issue. *See* J.A. 71–113, 144, 165, 184, 205. The court concluded certain claims in the '211, '398, and '639 applications met the written description, non-obviousness and novelty requirements for patentability and ordered the PTO to issue patents for those claims. *See id.* at 85–113.

The PTO appeals the district court's decision on prosecution laches, written description, and novelty, and challenges the district court's authority to order the PTO to issue a patent. *See* Appellant's Br. 5–6. Hyatt cross-appeals the district court's decision not to enter judgment on claims for which the Board reversed the examiner's rejections and that the PTO failed to dispute in court. Appellee's Br. 87–88. We have jurisdiction under 28 U.S.C. § 1295(a)(4).

STANDARD OF REVIEW

We review the district court's factual findings for clear error and its legal conclusions de novo. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1312 (Fed. Cir. 2016). We review a district court's determination of prosecution laches for abuse of discretion. *Cancer Research Tech. Ltd. v. Barr Lab'ys Inc.*, 625 F.3d 724, 728–29 (Fed. Cir. 2010). "'We may find an abuse of discretion on a showing that the court . . . exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *Si-Onyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1349 (Fed. Cir. 2020) (quoting *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1379 (Fed. Cir. 2008)).

DISCUSSION

Prosecution Laches

A

The doctrine of laches is an equitable affirmative defense. *Cancer Research*, 625 F.3d at 728. Prosecution laches may "render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under a totality of the circumstances." *Id.* (quotation and citation omitted). Finding an unreasonable and unexplained delay in prosecution "includes a finding of prejudice[.]" *Id.* at 729.

The prosecution laches defense originates from two Supreme Court cases in the early 1900s. *See Woodbridge v. United States*, 263 U.S. 50 (1923); *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924). In *Woodbridge*, the Court applied the doctrine to render a patent unenforceable based on a nine-year delay in prosecution. 263 U.S. at 53. The PTO had agreed with Woodbridge's request to delay the issuance of his patent for one year. *Id.* at 52. At the end of the year, the PTO neglected to issue the patent. *Id.* at 53. Woodbridge waited an additional eight-and-a-half years before sending a letter to the PTO calling attention to the application and explaining that he had waited because the delay enabled him to best avail himself of the patent's value. *Id.* He then sought to amend the specification and claims to capture related innovations that arose during the course of the delay. *Id.* The Court held that, by delaying to "mak[e] the term of the monopoly square with the period when the commercial profit from it would have been highest," Woodbridge "forfeit[ed] the right to a patent by designed delay." *Id.* at 56. The Court reasoned that

> [a]ny practice by the inventor and applicant for a patent through which he deliberately and without excuse postpones beyond the date of the actual invention, the beginning of the term of his monopoly, and thus puts off the free public enjoyment of the useful invention, is an evasion of the statute and defeats its benevolent aim.

*Id.* at 56.

The next year, in *Webster Electric*, the Court similarly held that an unreasonable delay of eight years rendered a patent unenforceable. 264 U.S. at 465, 471. The applicant filed a patent application in 1910. *Id.* at 464. In 1915, to provoke an interference against a separate, recently issued patent, the applicant filed a divisional application copying the patent's claims. *Id.* The applicant lost the interference

and then amended the divisional application by adding two new claims, claims 7 and 8, which issued in 1918 and were the subject of the litigation. *Id.* at 464–65. The Court explained that it was not until 1918 that the applicant intended to assert claims 7 and 8, which were broader than any he previously sought. *Id.* at 465–66. Meanwhile, "[d]uring all of this time the subject matter was disclosed and in general use, and [the applicant] and his assignee, so far as claims 7 and 8 are concerned, simply stood by and awaited developments." *Id.* at 465. The Court held claims 7 and 8 unenforceable, noting it had "no hesitation in saying that the delay was unreasonable, and, under the circumstances shown by the record, constitutes laches, by which the petitioner lost whatever rights it might otherwise have been entitled to." *Id.* at 466.

We have observed that, in enacting the Patent Act of 1952, Congress intended the prosecution laches defense to remain available. *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP*, 277 F.3d 1361, 1365–66 (Fed. Cir. 2002). P.J. Federico, an original drafter of the Act, explained in a renowned series of lectures following the Act's enactment that § 282 incorporated the defenses to infringement that were available at that time, including laches, such that they remained available to accused infringers. Pub. L. No. 82-593, 66 Stat. 792, 812; *see also* 35 U.S.C. § 282; P.J. Federico, *Commentary on the New Patent Act* (West 1954), *reprinted in* 75 J. PAT. & TRADEMARK OFF. SOC'Y 161, 215 (1993) (referring to defenses that may be raised in an action involving the validity or infringement of a patent and stating "this would include . . . equitable defenses such as laches, estoppel, and unclean hands").

Nearly eighty years after *Webster Electric,* we confirmed that prosecution laches, as a matter of law, is an available defense to patent infringement. *Symbol Techs.*, 277 F.3d at 1363, 1366–68. Soon after that we applied the doctrine for the first time, concluding that a patentee had

forfeited his right to a patent.  *In re Bogese*, 303 F.3d 1362, 1363 (Fed. Cir. 2002).  In *Bogese*, between 1987 and 1995, the applicant engaged in "deliberate and consistent course of conduct that has resulted in an exceptional delay in advancing the prosecution and the issuance of a patent."  *Id.* at 1365.  Specifically, he filed 12 continuation applications without amendment or addressing the reasons for the rejection and each time abandoned the previous application. *Id.* at 1363–65.  The patent examiner ultimately rejected all pending claims on the grounds that the applicant's actions "deliberately postponed meaningful prosecution, deliberately postponed the grant of any patent to which he may be entitled, and deliberately postponed the free public enjoyment" of the claimed inventions, evading the patent statute and defeating its benevolent aim.  *Id.* at 1365.

On review, the Board agreed with the examiner's decision, calling the applicant's actions "so egregious in defeating the policy of the patent laws of promoting science and the useful arts as to be presumed unreasonable."  *Id.* at 1366.  The harm caused by the applicant, the Board explained, was not only the delayed disclosure of his invention, but also the "deliberate delay of the term of any monopoly granted by a patent" until a time "when the industry has developed and matured to such a point as to be more financially beneficial to the applicant and hence more harmful or prejudicial to the public."  *Id.*

Bogese appealed to this court, challenging the PTO's exercise of authority to require him to advance the prosecution of his patent application.  *Id.* at 1369.  We held that that the PTO's sanction for undue delay under the doctrine of prosecution laches was not arbitrary, capricious, or contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706.  *Id.* at 1366–69.

Since *Bogese*, we have affirmed a prosecution laches determination one other time.  *See Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP*, 422

F.3d 1378, 1385 (Fed. Cir. 2005) ("*Symbol Technologies II*"). In *Symbol Technologies II*, the patentee's delays resulted in 18- to 39-year time periods between the filing of applications to the issuance of the patents in suit. *See id.* at 1386. The district court found that the patentee's patents ranked in the "'top thirteen positions' for the longest prosecutions" for the period from 1914 to 2001. *Id.* (citation omitted). On appeal, we explained that this type of delay "is not what is contemplated by the patent statute when it provides for continuation and continuation-in-part applications," and that such delay creates an "adverse effect on businesses that [are] unable to determine what [is] patented from what [is] not patented." *Id.*

In *Symbol Technologies II*, we provided examples of both reasonable and unreasonable delay. *Id.* at 1385. Three examples of reasonable delay include: (i) filing a divisional application in response to a restriction requirement, even if the filing occurs immediately before issuance of the parent application; (ii) refiling an application to present new evidence of an invention's unexpected advantages; and (iii) refiling an application "to add subject matter in order to attempt to support broader claims as the development of an invention progresses." *Id.* We clarified that these examples are not exhaustive and that an applicant could reasonably refile an application where that refiling "is not unduly successive or repetitive." *Id.*

In contrast, we explained, unreasonable delays involve repetitive refilings that demonstrate unjustifiable prosecution delay, for example, "refiling an application solely containing previously-allowed claims for the business purpose of delaying their issuance." *Id.* (citations omitted). We reasoned that the determination of unreasonable delay is not limited to the circumstances surrounding the particular application at issue; instead, "an examination of the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims, may trigger laches." *Id.* at 1385–86.

In *Cancer Research Technology Ltd. v. Barr Laboratories, Inc.*, we expanded the requirements for prevailing on a prosecution laches defense to infringement. 625 F.3d 724 (Fed. Cir. 2010). Specifically, we held that prosecution laches requires proving two elements: (a) that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances, and (b) that the accused infringer suffered prejudice attributable to the delay. *Id.* at 728–29. To establish prejudice, we explained, an accused infringer must show evidence of intervening rights, that is, that the accused infringer or others "invested in, worked on, or used the claimed technology during the period of delay."[8] *Id.* at 729. Because the defendant had not proven prejudice, we reversed the district court's judgment that the patent at issue was unenforceable for prosecution laches. *Id.* at 726, 731–32.

Although *Woodbridge*, *Webster Electric*, *Bogese*, *Symbol Technologies II*, and *Cancer Research* provide guidance on the application of laches in certain circumstances, we now address for the first time the PTO's assertion of a prosecution laches defense in a civil action brought by a patentee under 35 U.S.C. § 145 to obtain a patent.

B

Before turning to the merits of prosecution laches, we address the threshold issue of whether the PTO can assert the defense of prosecution laches in a § 145 action. We hold that it can. As we have explained, the PTO has the authority to deny patent issuance on prosecution laches grounds. *Bogese*, 303 F.3d at 1367 ("It necessarily follows that the PTO has the authority to reject patent applications for patents that would be unenforceable" for prosecution laches.).

---

[8]    *See, e.g.*, *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 988 F.3d 1334, 1338 (Fed. Cir. 2021) (discussing intervening rights).

The PTO also has the right to defend, in appeals before this court, its rejections of patent claims based on prosecution laches. *See id.* Further, the language of § 282 demonstrates Congress's desire to make affirmative defenses, including equitable ones such as prosecution laches, broadly available. *See* 35 U.S.C. § 282 (making available affirmative defenses, including "any other fact or act made a defense by this title," "in any action involving" patent validity); P.J. Federico, *Commentary on the New Patent Act* (West 1954), *reprinted in* 75 J. PAT. & TRADEMARK OFF. SOC'Y 161, 215 (1993) (explaining that Congress intended to incorporate equitable defenses including laches into the Patent Act of 1952). Defendants may accordingly assert the prosecution laches defense in district court infringement cases. *See Symbol Techs.*, 277 F. 3d at 1363. These factors point to the conclusion that the PTO should be permitted to assert the prosecution laches defense in a § 145 action. In our view it would make little sense for the PTO to have the authority to use prosecution laches as a basis for denying a patent, but to lack the authority to defend against issuance of a patent in a § 145 action on the same basis. Hyatt articulates no principled reason why we should adopt such an approach, and we are not otherwise aware of one.

Further, the PTO may assert the prosecution laches defense in a § 145 action even if it did not previously issue rejections based on, or warnings regarding, prosecution laches during the prosecution of an application that is at issue in the § 145 action. In *Kappos v. Hyatt*, the Supreme Court concluded that "there are no limitations on a patent applicant's ability to introduce new evidence in a § 145 proceeding beyond those already present in the Federal Rules of Evidence and the Federal Rules of Civil Procedure." 566 U.S. 431, 445–46 (2012). Following *Kappos*, we held that new evidence may be admitted "without regard to whether the issue was raised before the Board." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1325 (Fed. Cir. 2014). Under

these holdings, § 145 actions open the door to new evidence and arguments. Fairness dictates that the door must also remain open for the PTO to assert its meritorious defenses under the circumstances, including prosecution laches. Moreover, reserving the prosecution laches determination for infringement actions, but not § 145 actions, would harm the public's interest by allowing a patentee to enforce a patent that could have been barred for prosecution laches in an earlier § 145 action. While the PTO's failure to previously warn the applicant or reject claims based on prosecution laches may be considered as part of the totality of the circumstances in determining prosecution laches, it does not bar the PTO from asserting the defense in a § 145 action.

C

We turn next to the district court's decision on prosecution laches. We conclude that the district court misapplied the legal standard for prosecution laches in several respects. We address each in turn.

Totality of the Circumstances

The district court failed to properly consider the totality of the circumstances. The court stated that "th[e] totality principle does not apply in a manner as to require this Court to account for the entirety of the prosecution history of each related application from its inception to final disposition." *Iancu*, 332 F. Supp. 3d at 131. The district court then focused predominantly on the PTO's role in the prosecution of Hyatt's four applications at issue and repeatedly discounted or ignored evidence showing that Hyatt's conduct caused unreasonable and unexplained delay. *See Iancu*, 332 F. Supp. 3d at 122–39.

For example, the district court ignored evidence of Hyatt's pattern of rewriting or shifting claims midway through prosecution in applications other than the four at issue in this case because that claim shifting "long

postdate[d] the close of prosecution" of the four applications at issue here. *Id.* at 129–30. The court later concluded that the PTO's claim shifting evidence failed to meet the PTO's burden because "it is 'not unusual to see a few claims re-written'" and because "the PTO accepted the amendments and continued examination" of the applications in question. *Id.* at 137 (citation omitted).

The court also refused to consider evidence of Hyatt's pattern of prosecution conduct after 2012, when the PTO resumed prosecution of Hyatt's applications. *Id.* at 132. It explained that it "ascribe[d] no weight to the subsequent prosecution history of other applications not before the Court following the onset of litigation in these matters." *Id.* The district court likewise reasoned, "That the PTO finally, in 2015, got fed-up enough with the difficulties of examin-ing Mr. Hyatt's claims that it began issuing prosecution laches rejections, does not itself have any relevance to this Court's treatment of the applications' respective prosecu-tion histories through 2002." *Id.* at 136–37.

The district court also discounted evidence of Hyatt's October 1995 agreement with Director Godici because the parties "did not reach any agreement that the Court can now enforce." *Id.* at 135. The district court further gave "little weight" to the fact that, in recent years, the PTO has spent more than $10 million administering Hyatt's appli-cations whereas Hyatt has spent approximately $7 million in fees. *Id.* at 137.

In addition, the court discounted evidence that Hyatt had filed four claims that he had already lost in interfer-ence proceedings. The court explained that this "unreason-able conduct as to four allegedly illustrative claims does very little to move the ball in consideration of the totality of Mr. Hyatt's conduct across approximately 115,000 claims." *Id.* at 138.

These examples of discounting or ignoring evidence—indeed swaths of evidence in certain situations—regarding

Hyatt's prosecution conduct as a cause for delay illustrate that the district court failed to follow this court's guidance on considering the totality of the circumstances. We have explained that "an examination of the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims, may trigger laches." *Symbol Technologies II*, 422 F.3d at 1386. Rather than consider the relevant evidence of conduct causing delay across Hyatt's GATT Bubble applications—which overlapped, for example, in subject matter, claim scope, and priority disclosures, and were filed together as photocopies of a small group of applications—the district court erred in considering only the period up to 2002 and erred insofar as it focused its analysis on the four specific applications at issue in this case to the exclusion of Hyatt's other GATT Bubble applications. The district court did not appreciate the PTO's evidence as that of a consistent pattern of conduct across an enormous body of similar applications. The district court's review of the evidence did not, therefore, encompass the totality of the circumstances.

### Undue Emphasis on the PTO's Conduct

The district court further applied an incorrect legal standard in a way that affected its entire decision: Rather than analyze the evidence to determine whether Hyatt's conduct warrants a finding of prosecution laches, the court repeatedly placed blame on the PTO for the slowness with which Hyatt's applications were prosecuted.

We have explained that "a delay by the PTO cannot excuse the appellant's own delay." *Bogese*, 303 F.3d at 1369. Although the district court gave lip service to this principle, it effectively used the "totality of the circumstances" standard as a vehicle for blaming the PTO for the prosecution delays. *See, e.g.*, *Iancu*, 332 F. Supp. 3d at 122 (stating that "under the totality of circumstances test[, the] PTO's actions and omissions can likewise be considered in

determining the reasonableness of any delay actually attributable to the applicant"); *see also id.* at 132 (stating that the totality of circumstances includes "the greater context of his interactions with PTO, and the agency's actions or failures to act, of which the near-decade of suspended examination is but one example"). Notably, the district court cited no legal authority supporting its emphasis on the PTO's actions and inactions.

Specifically, the district court faulted the PTO for using its normal procedures when examining Hyatt's applications. *Id.* at 132–33. The court reasoned that the atypical nature of Hyatt's GATT Bubble applications "required [the PTO] to employ and embrace atypical procedures for addressing the challenge before them." *Id.* at 133. There is no legal requirement, the court explained, for the PTO to be "wedded" to its policy of using compact prosecution. *Id.* The court placed responsibility squarely on the PTO for the fact that processing Hyatt's applications was like trying to fit a "large proverbial square peg" into "the rounded-out and well-trodden hole of its 3,000 page practice manual." *Id.* at 134.

The district court also erroneously found that the PTO is solely responsible for the suspension of prosecution from 2003 to 2012—which the PTO did not rely on to prove delay. *See id.* at 131. It reasoned that the PTO's stipulation on that score "functions as an admission that the PTO shoulders responsibility for the delay during that period." *Id.* But the PTO's stipulation, which was offered by the PTO but not ultimately agreed upon by the PTO and Hyatt, was an attempt by the PTO to streamline the trial. Appellant's Br. 17 n.4. The PTO argues, persuasively, that the "period was directly attributable to Mr. Hyatt's numerous challenges to USPTO procedures because, depending on the outcome of those cases, time the USPTO spent examining roughly 400 pending applications could have been rendered meaningless." *Id.*

The court also faulted the PTO for not taking actions that it could have taken during the restricted period the court considered, i.e., up to 2002. It pointed out that the "PTO had ample opportunity over many years to act to resolve its difficulties through formal means" instead of "await Mr. Hyatt's help, which, it appears obvious, was not forthcoming." *Iancu*, 332 F. Supp. 3d at 134. Because it did not use more "formal means," the district court explained, the PTO failed to give Hyatt adequate notice and opportunity to cure "the allegedly offensive conduct." *Id.* The district court also relied on the fact that the PTO did not "take action to enforce compliance with the informal agreements it now argues it had with Mr. Hyatt." *Id.* at 135. Summing up, the court stated that "the PTO itself did nothing to police the conduct they now complain of for the better part of two decades." *Id.* at 137.

While faulting the PTO in the ways described above, the district court repeatedly emphasized the broad latitude and discretion that applicants including Mr. Hyatt have in prosecuting their applications as they choose within the law and PTO regulations. *See, e.g.*, *id.* at 134 (stating that Hyatt had "discretion as to how to prosecution [his] claims"). According to the court, Hyatt would have assisted the PTO if it were "in Mr. Hyatt's interest to" do so, and Hyatt should not be penalized for choosing "instead to pursue his own private enterprise while the bureaucracy fulfills its duties to the applicant and to the public." *Id.* Similarly, the court explained that, although Hyatt "'could have' been more helpful during the examination process," "there is no abstract requirement for a citizen to tailor his conduct in pursuit of his constitutional right to a patent, to conform to what is 'feasible' for the agency." *Id.* at 135. However, the doctrine of prosecution laches itself—the subject of the district court's analysis—is one example of an obligation to tailor prosecution conduct in pursuit of patent rights.

In the above ways, the district court erred by improperly focusing the analysis on the PTO's conduct rather than Hyatt's conduct. It is not the case that an applicant may prosecute his patents however he or she wishes within the statute and PTO regulation, because the doctrine of prosecution laches places an additional, equitable restriction on patent prosecution conduct beyond those imposed by statute or PTO regulation. An applicant must therefore not only comply with the statutory requirements and PTO regulations but must also prosecute its applications in an equitable way that avoids unreasonable, unexplained delay that prejudices others. *See Cancer Research*, 625 F.3d at 729.

Further, the PTO's conduct may be considered in the totality of circumstances, but its delay "cannot excuse the [applicant's] own delay" in prosecution. *Bogese*, 303 F.3d at 1362. Indeed, the patent statute already deals with delay by the PTO when it provides for patent term adjustment to account for that delay. *See* 35 U.S.C. § 154(b); *Supernus*, 913 F.3d at 1353. The PTO's delay therefore provides a weak reason to negate prosecution laches, which asks a separate question of whether the patent should issue, or if issued is enforceable, in light of the applicant's prosecution conduct.

Nor does the PTO's failure to adopt special procedures to accommodate extreme prosecution conduct negate prosecution laches. The PTO is entitled to adopt rules and practices to efficiently administer the patent examination system set up by the patent statute. Requiring the PTO to adopt tailored approaches to make sure that each applicant that delays, is unresponsive, or is otherwise outside normal prosecution conduct successfully progresses through prosecution would impose obligations on the PTO not contemplated by the statute. The applicant is in the driver's seat and must take care to avail itself of the PTO's beneficial patent examination process as it stands and in a way that avoids undue delay leading to prejudice imposed on others.

Here, the PTO's instructions to, for example, provide written description support and priority date support, its instructions to demarcate the applications, its creation of a new art unit, and its issuance of atypical Requirements demonstrate that the PTO did not stand back and do nothing, but rather it notified Hyatt of its own obligations and requirements and thereby gave him the opportunity to avoid prosecution laches. Prosecution laches does not strictly require formalized notice, warnings, or office actions, although those may well lend support to a prosecution laches finding.

In sum, the district court's restricted view of the record, as well as its overemphasis on the PTO's actions and inactions and its repeated excuse of Hyatt's prosecution conduct, amounted to a misapplication of the legal standard governing prosecution laches. We clarify, consistent with the above discussion and our past precedent, that prosecution laches considers the totality of circumstances, *Symbol Technologies II*, 422 F.3d at 1386, and that the PTO's delay does not excuse an applicant's delay, *Bogese*, 303 F.3d at 1369.

D

We turn to the question of whether the PTO's prosecution laches evidence and arguments presented at trial are enough to shift the burden to Hyatt. We hold that they are.

Unreasonable and Unexplained Delay

Whether an applicant's delay is unreasonable depends on the specific circumstances. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992), *overruled on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954 (2017); *see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed. Cir. 1993) ("The reasonableness of the behavior of the person against

whom laches is asserted depends on the facts of the particular case.").

As described above, the trial record shows that Hyatt filed 381 applications during the GATT Bubble—the most of any filer. Each application was a photocopy of one of 11 earlier parent applications, and each had a small set of claims, many of which were identical to each other. Simply put, Hyatt's applications were placeholders. Director Godici then met with Hyatt instructing Hyatt to focus each application on a separate invention, and Hyatt agreed. Since then, Hyatt has expanded his claim count to at least 115,000, an average of about 300 per application.

The magnitude of Hyatt's delay in presenting his claims for prosecution suffices to invoke prosecution laches. On multiple occasions, the Supreme Court has found patents unenforceable based on eight- and nine-year prosecution delays. *See, e.g.*, *Woodbridge*, 263 U.S. at 53, 56 (nine-and-a-half-year delay); *Webster Electric*, 264 U.S. at 465 (eight-year delay); *see also Bogese*, 303 F.3d at 1369 (eight-year delay). The PTO presented evidence establishing that Hyatt's four applications at issue claimed priority to applications filed in the early 1970s and 1980s, meaning that Hyatt delayed between 12 to 28 years to present his claims for prosecution. In fact, the PTO presented additional evidence that Hyatt had delayed similar amounts across all his GATT Bubble applications. The following table presented at trial, for example, demonstrates Hyatt's delay across all pertinent applications:

| Hyatt Patent Application Family | Number of Pending Applications | Range of Filing Dates of Pending Applications | Earliest Claimed Priority Date | Earliest Identical Specification |
|---|---|---|---|---|
| 4 | 18 | Nov. 9, 1977 – June 6, 1995 | Dec. 28, 1970 05/101,881 | Nov. 9, 1977 05/849,812 |
| 8 | 16 | May 3, 1995 – June 5, 1995 | Dec. 28, 1970 05/101,881 | Dec. 2, 1988 07/279,592 |
| 7 | 30 | Apr. 3, 1986 – Apr. 21, 1995 | Dec. 28, 1970 05/101,881 | April 7, 1986 06/849,243 |
| 11 | 22 | Dec. 3, 1987 – May 31, 1995 | Dec. 28, 1970 05/101,881 | Dec. 3, 1987 07/128,659 |
| 10 | 100 | Dec. 22, 1988 – Dec. 6, 2004 | Oct. 17, 1984 06/661,649 | Dec. 22, 1988 07/289,355 |
| 2 | 19 | Mar. 30, 1990 – June 6, 1995 | Nov. 24, 1969 04/879,293 | Dec. 27, 1989 07/457,451 |
| 6 | 30 | Oct. 10, 1989 – June 1, 1995 | Dec. 28, 1970 05/101,881 | Oct. 10, 1989 07/419,911 |
| 12 | 44 | May 1, 1995 – June 6, 1995 | Feb. 14, 1975 05/550,231 | Mar. 22, 1993 08/034,627 |
| 9 | 67 | Sept. 20, 1991 – Jan. 19, 1996 | Nov. 24, 1969 04/879,293 | June 15, 1983 06/504,691 |
| 1 | 10 | Mar. 13, 1990 – June 6, 1995 | Dec. 28, 1970 05/101,881 | Mar. 13, 1990 07/493,061 |
| 5 | 30 | May 25, 1989 – May 31, 1995 | Dec. 28, 1970 05/101,881 | May 25, 1989 07/357,570 |

J.A. 30211.[9]

Hyatt disputes that the claims at issue were delayed 12 to 28 years. Relying on the latest possible priority dates, Hyatt argues that he delayed only seven to 11 years to file the four applications at issue and between 10 and 19 years before presenting the claims now in dispute. *See* Appellee's Br. 27; Appellant's Response and Reply Br. 7. Even accepting Hyatt's arguments on this score, these quantities of time are enough to trigger prosecution laches. *See, e.g.,* *Woodbridge*, 263 U.S. at 53, 56; *Webster Electric*, 264 U.S. at 465; *Bogese*, 303 F.3d at 1369.

Beyond merely the magnitude of Hyatt's delay in filing his claims, Hyatt adopted an approach to prosecution that all but guaranteed indefinite prosecution delay. The PTO

---

[9]    This table includes the four Hyatt applications at issue in this case: the '639 application is in family 8; the '211 and '398 applications are in family 10; and the '062 application is in family 12.

presented evidence at trial demonstrating that multiple characteristics of Hyatt's application and claim web, when combined, made it effectively impossible for the PTO to process them.

For one, the applications claim priority to a large number of earlier applications, creating a large number of possible priority dates. This reality frustrated the examiners' ability to take the preliminary step of identifying the relevant body of prior art for purposes of examining the claims. *E.g.*, J.A. 29425–26.

Exacerbating this problem was the length and complexity of both the specifications themselves and those of the priority applications. As Mr. Morse testified, it was not enough for an examiner to merely find a claim element or group of claim elements in a claimed priority reference; instead, the examiner had to identify the particular interconnection of elements claimed, which was extraordinarily difficult and time consuming. J.A. 29435–36, 29544, 29570–71. Notably, the PTO did not digitize its files until 2003, so before that point examiners needed to wade through large stacks of paper to determine, for example, written description or the priority date. J.A. 29419–20 ("You would have 30-foot high stacks you would be comparing against each other looking for double patenting."). Even in determining written description long after the documents became digitized, the district court noted that it took "many weeks of trial," relying "heavily upon the new evidence presented at trial, in the form of expert testimony," to make the written description findings. J.A. 87 n.22. Despite these challenges' obvious effect of delaying prosecution, Hyatt went many years failing to identify written description support for his claims. *See, e.g.*, J.A. 36700–01.

Hyatt also engaged in a pattern of filing amendments adding hundreds of claims to each application, effectively starting examination from the beginning. *See, e.g.*,

J.A. 31869–72. Many of these claims were not unique; instead Hyatt repeatedly filed identical or patentably indistinct claims across different applications. *See, e.g.*, J.A. 31874–84. Hyatt further frustrated examiners by engaging in a pattern of rewriting claims entirely or in significant part midway through prosecution, thereby, again, restarting examination. *E.g.*, J.A. 29550–51.

All of the above patterns of prosecution conduct created a perfect storm that overwhelmed the PTO. *See, e.g.*, J.A. 29981–83. It was virtually impossible for examiners to perform a double patenting analysis. *See, e.g.,* J.A. 29912. The same was true, as already mentioned, with respect to determining priority dates and identifying written description support. The PTO's witnesses testified that Hyatt's approach to prosecution was unique and created an "extreme situation" at the PTO. *E.g.*, J.A. 29417–21, 29467–68, 29471–73, 29893, 29980–81.

The PTO also showed that Hyatt had engaged in specific, exemplary acts during prosecution that were patently unreasonable. For example, Hyatt filed claims that he had previously lost in interference proceedings. *Iancu*, 332 F. Supp. 3d at 138. Whether Hyatt did so purposely is not material because these actions suggest, at a minimum, that his prosecution approach had overwhelmed even his own ability to manage his applications and claims.

We also conclude that no reasonable explanation has been shown to justify Hyatt's prosecution approach. As the record shows, Hyatt agreed with Director Godici in October 1995 to demarcate his applications, but he then did precisely the opposite to an extreme degree. Twenty years later, Hyatt acknowledged he lacked a "master plan" for demarcating his applications. *Iancu*, 332 F. Supp. 3d at 132 n.12; J.A. 204921. Any goal Hyatt may have had of, for example, correctly capturing his inventions or steering clear of prior art, as Hyatt argued at the dismissal stage, could not come close to justifying the particular, multi-

faceted approach he took to prosecution when viewed in its entirety. *See, e.g.*, Pl.'s Opp. to Def.'s Mot. to Dismiss for Prosecution Laches at 12, Hyatt v. Matal, No. 1:05-cv-02310-RCL (D.D.C. Jan. 9, 2017), ECF No. 101. Nor can the contention that some or all of Hyatt's conduct was not literally violative of law or PTO regulation provide an adequate explanation under these circumstances. *See id.* Hyatt's conduct—including his delay in presenting claims, his creation of an overwhelming, duplicative web of applications and claims, and his failure to cooperate with the PTO—was a clear abuse of the patent system, even if it did not literally violate regulations or statutory provisions.

When the above circumstances are considered in their totality, we believe the conclusion is inescapable that the PTO satisfied its burden of proving that Hyatt engaged in unreasonable and unexplainable delay, as prosecution laches requires. Hyatt's pattern of conduct resembles, but goes well beyond, Bogese's consistent pattern of receiving a rejection on an application, filing a continuation application without any amendments, and abandoning the original application. *Bogese*, 303 F.3d at 1364–65. Hyatt's time-wasting process obstructed the PTO from examining not only Hyatt's four applications at issue, but nearly all of his GATT Bubble applications.

## Prejudice[10]

This case requires us to address the prejudice requirement of prosecution laches for the first time in a case where

---

[10]    Although the parties briefed the prejudice element of prosecution laches during the district court action, the district court did not squarely address the issue in its order on prosecution laches. *See generally Iancu*, 332 F. Supp. 3d at 113–39; *see also* Def.'s Mot. to Dismiss for Prosecution Laches at 41–43, Hyatt v. Matal, No. 1:05-cv-02310-RCL

the PTO asserts the defense in a § 145 action. Our precedent to date establishes that, to prove prosecution laches in the context of an infringement action, an accused infringer must prove prejudice attributable to the patentee's delay. *Cancer Research*, 625 F.3d at 729. Proving prejudice in that context requires proving intervening rights, i.e., "that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." *Id.*

In the context of laches, we have held that a delay of more than six years raises a "presumption that it is unreasonable, inexcusable, and prejudicial." *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). That presumption shifts the burden to the patentee to prove that "either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice." *Id.* Presumptions of fact such as this "have been created to assist in certain circumstances where direct proof of a matter is for one reason or another rendered difficult." *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1581 (Fed. Cir. 1984), *overruled on other grounds by Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). Presumptions "arise out of considerations of fairness, public policy, and probability, and are useful devices for allocating the burden of production of evidence between the parties." *Id.*

Hyatt argues that the district court's decision should be affirmed because the PTO did not adequately prove intervening rights. Appellee's Br. 56. The PTO responds that the intervening rights requirement does not apply to the PTO in the context of a § 145 action to obtain a patent. Appellant's Response and Reply Br. 36–37. Consistent

(D.D.C. Nov. 22, 2016), ECF No. 91; Pl.'s Opp. to Def.'s Mot. to Dismiss for Prosecution Laches at 27–29, Hyatt v. Matal, No. 1:05-cv-02310-RCL (D.D.C. Jan. 9, 2017), ECF No. 101.

with both *Cancer Research* and *Wanlass*, we now hold that, in the context of a § 145 action, the PTO must generally prove intervening rights to establish prejudice, but an unreasonable and unexplained prosecution delay of six years or more raises a presumption of prejudice, including intervening rights. Applying these principles, we conclude that the PTO's demonstration of an unreasonable and unexplained delay by Hyatt, which exceeds six years by any measure, shifts the burden to Hyatt to prove lack of prejudice.

We further hold that, where a patent applicant has committed a clear abuse of the PTO's patent examination system, the applicant's abuse and its effects meet the prejudice requirement of prosecution laches. A clear abuse of the patent system occurs when, for example, the applicant's conduct unduly increases the administrative burden on the PTO and thereby effectively taxes everyone using the system. Such abuse also demonstrates a dangerous likelihood that the applicant is harming the public's interests more broadly, diminishing the patent system's benevolent nature, and stifling innovation and creativity in the useful arts. In rare circumstances like these, an applicant's conduct and its effects on the PTO can alone suffice to prove prejudice for purposes of the prosecution laches defense in a § 145 action.

We conclude that the PTO has carried its burden of proving that Hyatt engaged—intentionally or not—in a clear abuse of the PTO's patent examination system that contributed to delay in the four applications at issue. Barring significant evidence to the contrary from Hyatt, the PTO has therefore demonstrated material prejudice. Hyatt's approach to prosecuting his GATT Bubble applications made it impossible for the PTO to process them using its normal compact prosecution procedures. The PTO created an art unit to deal specifically with his applications and began using atypical procedures to ascertain the information needed to process the applications. The PTO spent

approximately $10 million administering Hyatt's applications over a period of about five years—during which Hyatt paid only $7 million in fees. *Iancu*, 332 F. Supp. 3d at 137. The new art unit was capable of examining about 900 typical applications per year but could not come close to that number when examining Hyatt's applications. J.A. 31885. According to PTO data, a typical examiner could prepare an office action for a typical application in two to three days, but each office action for Hyatt's applications took approximately four months. J.A. 31885–86. The PTO therefore estimated that it would take 532 years of examiner time to complete the prosecution of his roughly 400 applications, during which it could complete over 40,000 typical applications. J.A. 31886.[11] These exemplary figures, combined with the details surrounding Hyatt's pattern of prosecution conduct, show that the PTO has carried its burden of proving that Hyatt's prosecution of his applications clearly abused the PTO's patent examination system and that that clear abuse contributed to the delay that occurred with respect to the four applications at issue. Under our holdings above, this abuse may establish prejudice for prosecution laches purposes.

## DISPOSITION

In certain circumstances this court and our sister circuits have retained jurisdiction over appeals and held them in abeyance pending resolution of a limited issue. *See, e.g.*,

---

[11] The PTO's expert additionally opined, based on PTO data, that the average GATT Bubble application undergoes three office actions, while Hyatt's have undergone on average 15.7 office actions. J.A. 39279. He also opined that comparing each of Hyatt's 115,000 pending claims to each other to determine double patenting would require 6.6 billion comparisons, and that, assuming one minute per comparison, that analysis would take over 12,000 years. J.A. 39280.

*Tempur-Pedic Mgmt., Inc. v. FKA Distrib. Co.*, 481 F. App'x 615 (Fed. Cir. 2012); *Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*, 729 F. App'x 936, 938 (Fed. Cir. 2018); *Patel v. Haro*, 443 F. App'x 17, 18 (5th Cir. 2011) ("We retain jurisdiction over the appeal except for the purposes of the limited remand."); *Sickle v. Torres Advanced Enter. Sols., LLC*, 653 F. App'x 763, 764 (D.C. Cir. 2016) ("[T]his case will be held in abeyance pending resolution of the limited jurisdictional question on remand."); *United States v. Hinojosa-Bencomo*, 7 F.3d 1045 (10th Cir. 1993) ("We retain jurisdiction over the balance of this case and hold in abeyance our judgment pending resolution of *United States v. Nichols*."); *Hayden v. Pataki*, 449 F.3d 305, 371 (2d Cir. 2006); *Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 867 (3d Cir. 1997).  Consistent with this precedent, and given the potential for the prosecution laches issue to resolve the entire case at hand, we retain jurisdiction over the appeal with respect to the anticipation and written description issues, and we remand to the district court for the limited purpose of affording Hyatt the opportunity to present evidence on the issue of prosecution laches, consistent with the standards set forth in this opinion.  *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 917 F.2d 107, 110–11 (3d Cir. 1990) ("[A] defendant moving for a directed verdict retains the right to present evidence against the plaintiff's case whether its motion is denied at the trial or appellate level.").

On remand, the district court should bear several points in mind.  First, regarding the unreasonable and unexplained delay requirement of prosecution laches, the record shows that Hyatt has already proffered a number of reasons for his delay, including that he timely completed examination four applications at issue; that his conduct during prosecution of his other GATT Bubble applications is irrelevant to the prosecution laches analysis; that he filed his GATT Bubble applications to cover a number of

inventions he believed he had made; and Hyatt met statutory requirements and followed the PTO's rules in prosecuting his applications. We conclude that, under the circumstances of this case, these reasons without more are insufficient as a matter of law to negate that Hyatt's delay was unreasonable and unexplained. To carry his burden, Hyatt must show by preponderance of evidence that Hyatt had a legitimate, affirmative reason for his delay. Such a reason must operate to excuse Hyatt from responsibility for the sizable undue administrative burden that his applications have placed on the PTO in its efforts to process Hyatt's applications, which the record before us demonstrates to be extreme. More specifically, any satisfactory reason must, at a minimum, justify Hyatt's decision to ignore Director Godici's instruction to demarcate his applications in 1995; justify his decision to adopt the specific prosecution approach that he did—unique in its scope and nature—as detailed in the PTO's Requirements; and justify his failure to develop a plan for demarcating his applications over at least the 20 year period from 1995 to 2015, *see, e.g.*, J.A. 204921. Any reasons that fall short of justifying those decisions or omissions fail to negate that his delay has been unreasonable and unexplained. We can divine no reason in the record currently before the court that would suffice, but Hyatt is entitled as a matter of fairness to present evidence and be heard on this issue.

In determining whether Hyatt's delay has caused prejudice, the district court should bear in mind that, as we explain above, Hyatt's delay of more than six years, by any measure, shifts the burden to Hyatt to prove that Hyatt's delay has not caused the PTO or any third party material prejudice. The district court should also bear in mind our conclusion above that the PTO has carried its burden of proving that Hyatt's prosecution conduct amounted to a clear abuse of the PTO's patent examination system, which may alone suffice to satisfy the prejudice requirement of prosecution laches. The record before us shows, for

example, that the PTO has created a distinct art unit for Hyatt's applications; that the PTO has recently spent millions more dollars processing Hyatt's applications than Hyatt has paid in fees; that examiners have spent inordinate amounts of time preparing office actions; and that the PTO has resorted to special, customized procedures involving its Requirements to process Hyatt's applications. We again cannot guess what might negate this evidence of prejudice. But be that as it may, we recognize that Hyatt is entitled to present evidence that his delay did not cause prejudice.

## CONCLUSION

The PTO carried its burden of proving prosecution laches, and the district court erred in granting Hyatt's Rule 52(c) motion for judgment on partial findings. We vacate the district court's grant of the motion, and we remand for the district court to conduct further proceedings, as promptly as possible consistent with principles of fairness, affording Hyatt the opportunity to present evidence on prosecution laches. We hold in abeyance this appeal with respect to the issues of anticipation and written description pending the district court's remand decision on prosecution laches. We have considered the parties' remaining arguments and do not find them persuasive or do not reach them. For the above reasons, we vacate-in-part and remand for further proceedings consistent with this opinion.

## VACATED-IN-PART AND REMANDED

### COSTS

No costs.